Irvin BRAY et al., Plaintiffs,

v.

SAFEWAY STORES, INC., et al.
Defendants.

No. C–48538–OJC.

United States District Court,
N. D. California.

March 4, 1975.

Law offices of Joseph L. Alioto, Joseph L. Alioto, and Joseph M. Alioto, San Francisco, Cal., for plaintiffs.

Arthur B. Dunne, Louis L. Phelps, Dunne, Phelps & Mills, San Francisco, Cal., Denis McInerney, Cahill, Gordon & Reindel, New York City, for defendants.

## ORDER DENYING DEFENDANT MOTION FOR JUDGMENT N. O. V. OR, ALTERNATIVELY, A NEW TRIAL

OLIVER J. CARTER, Chief Judge.

This action was brought by a number of cattlemen against the three largest retail grocery chains in the United States for violation of Section 1 of the Sherman Act. The plaintiffs specifically charged that the defendants, in combination with a number of named co-conspirators, conspired to and in fact did regulate the price the plaintiffs received for their beef.

Safeway Stores, Inc. (Safeway) and The Kroger Co. (Kroger) settled with the plaintiffs and, at the time the matter went to trial The Great Atlantic & Pacific Tea Company, Inc. (hereinafter referred to alternatively as the defendant and A & P) was the only remaining defendant.

After a six week trial the jury returned a verdict against A & P and in favor of the plaintiffs in the amount of $10,904,027; it was this amount that the Court subsequently trebled.

A & P has moved the Court for a judgment n. o. v. or, alternatively, a new trial. The Court will discuss each motion separately, although many of the same arguments are applicable to each.

## MOTION FOR JUDGMENT N. O. V.

The defendant's motion for judgment n. o. v. is concerned with basically two areas: the alleged conspiracy and the damages.

I. *Conspiracy*

A. Sufficiency of the evidence: The defendant adamantly maintains that there exists no evidence supporting the finding that there existed a conspiracy to fix or regulate meat prices. What the defendant essentially argues, however, is not that there exists a failure of evidence, but that the jury incorrectly interpreted the evidence that was presented. This, of course, is a standard inappropriate to a motion for judg-

ment n. o. v. It is not the province of this Court to weigh conflicting evidence or determine the credibility of witnesses. It is the defendant's burden to demonstrate the lack of factual foundation supporting the jury's verdict. *Lavender v. Kurn*, 327 U.S. 645, 652–3, 66 S.Ct. 740, 90 L.Ed. 916 (1946).

The defendant states seven specifications in support of its contention that the plaintiffs failed to prove a conspiracy existed: (1) there was no evidence of an agreement between A & P and any alleged co-conspirators; (2) there was no evidence of contact by A & P with any competitor; (3) there was no exchange of information between competitors; (4) there was no evidence of conscious parallel action; (5) there was no evidence as to how the alleged agreement or combination to fix prices might have occurred or been implemented; (6) there was no evidence that any conduct by A & P had a detrimental effect on the plaintiffs; (7) there was no evidence as to the ability of A & P and other alleged co-conspirators to fix the price of wholesale meat products.

Each of these specifications is best discussed, not in the order raised by the defendant, but as each is encountered in a general examination of the conspiracy evidence presented at the trial. This evidence will be discussed in three sections: the acts of the defendant and the co-conspirators that support the jury's conclusion that a conspiracy existed; the ability of the defendant and the co-conspirators to carry out the conspiracy; the economic effects of the conspiracy.

*Acts*

The primary vehicle through which the price fixing conspiracy was developed and effectuated was the National Association of Food Chains (NAFC). There is little question that A & P was a member of the NAFC and participated in several meetings sponsored by the or-

ganization. The defendant strenuously argues that the NAFC constituted a legitimate trade association and thus no negative inferences may be drawn from the defendant's membership or participation. Although a trade association may certainly perform legitimate functions,[1] the mere fact of membership will not automatically provide a defendant with an impenetrable cloak of respectability.

The defendant's reliance upon *Maple Flooring Manufacturers Association v. United States*, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925) is misplaced. *Maple Flooring* was not concerned with price fixing. The court noted that

"[b]efore considering these phases of the activities of the association [i. e., those activities subsequently determined to be legal], it should be pointed out that it is neither alleged nor proved that there was any agreement among the members of the association either affecting production, fixing prices, or for price maintenance . . . [I]t was not seriously argued before this court that any substantial uniformity in prices had in fact resulted from the activities of the association." *Maple Flooring Manufacturers Association v. United States, supra* at 567, 45 S.Ct. at 579.

A case more germane to the issue is *Federal Trade Commission v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948), in which the Supreme Court, confronted by an argument similar to that made by A & P, responded in the following manner:

"The issues in the present Commission proceedings are quite different from those in the *Old Cement* case[2] [and the *Maple Flooring* case] . . . In the first place, unlike the *Old Cement* case the Commission does here specifically charge a combination . . . And here the Commission

---

1. And the jury was so instructed (RT: 3625).

2. Cement Manufacturer's Protective Association v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925).

has focused attention on this issue, having introduced evidence on the issue . . . " Federal Trade Commission v. Cement Institute, *supra* at 708, 68 S.Ct. at 807.

And, most importantly, the invalidity of the defendant's activities was upheld.

■ Membership in the NAFC is thus, at first, a neutral fact; the jury must examine the organization and determine to its own satisfaction whether the Association was being utilized for illegal purposes. The NAFC possesses no per se immunity against a charge of price fixing.

The plaintiffs contended at the trial that the NAFC was something much more than a legitimate trade association. The Association's constituency is made up of the largest retail food chains in the United States; small grocery companies and independents are not eligible for membership. The retail chains that constitute the NAFC are the largest purchasers of carcass beef in the United States.

The plaintiffs introduced evidence that supports the conclusion that the NAFC provided at least a forum for the membership to discuss meat prices and profit margins. An owner of Winn-Dixie, one of the alleged co-conspirators, testified that meat margins had been discussed at NAFC meetings since 1963. (RT: 1037–51). Topics for discussion at the NAFC Meat Committee meetings included specifics as to prices. (Exhibit 111; RT: 2038–9). Information concerning meat and meat prices was requested by the NAFC from its members. (RT: 2260).

In a case such as this, where there does not exist an express price fixing agreement, the opportunity to discuss prices is of paramount importance. C-O-Two Equipment Co. v. United States, 197 F.2d 489, 493 (9th Cir. 1952). The evidence presented by the plaintiffs not only demonstrated the existence of such an opportunity, but indicated that prices had in fact been discussed.

One of the most significant aspects of the plaintiffs' case concerned the aura of secrecy surrounding the NAFC meat discussions. The meeting topics, agenda, and minutes were labelled confidential and were generally unavailable. Meeting participants were identified, not by name or company, but by color-coded badges; anonymity was assured by the Association. The reluctance of A & P officials to admit their participation in the meetings was obvious throughout the trial. One high A & P official in charge of meat marketing went so far as to deny even meeting representatives of other retail chains under any circumstances—a denial that withered when confronted by photographic evidence to the contrary. (RT: 3245). The plaintiffs attempted to paint the various representatives of A & P and the other co-conspirators in hues of secrecy and deceit. To this end the plaintiffs may well have succeeded, and not without foundation.

The evidence also indicated that the NAFC had operated programs that could have had a significant effect on meat prices. The Association was utilized to coordinate a "specials" program among its members to relieve a beef oversupply. Although the defendant maintained that the specials program was instituted only at the insistence of the cattlemen or farmer, the result of the program could well have been the stabilization of meat prices and higher meat profits. At the very least, this evidence indicates the NAFC's active concern with prices and its potential as a device for the manipulation of prices.

The defendant argues in some detail that all of the evidence mentioned above can be logically explained. A & P scoffs at the plaintiffs' characterization of the NAFC meetings as anonymous. The open nature of the meetings is stressed and the defendant argues that "[a] less surreptitious and unlikely setting to this plot or any other type of conspiracy could, of course, hardly be imagined." (Defendant's Reply Brief, at 7). The

discussion of meat prices between officials of various retail food chains is described as "innocuous". The specials program, arranged at the behest of the producers, is characterized as a "generous act". The Court does not mean to imply that the above characterizations are untenable; the evidence could certainly have been interpreted in the manner sought by the defendant. However, the quotations are illustrative of the tenor of the defendant's argument: that the Court should usurp the function of the jury and accept the defendant's interpretation of the evidence. The defendant had an opportunity to make the above arguments to the jury and did so; the jury was apparently unpersuaded.

■ As noted above, the defendant's interpretations of the evidence may certainly be plausible. Plausibility is not, however, to be confused with a lack of evidence. There was sufficient evidence to support the conclusion that at various secret meetings members of the NAFC —competitors in the beef market—met not only to discuss prices of meat, but to forge agreements concerning the fixing of those prices.

*Ability*

■ Despite the defendant's assertions to the contrary, the evidence relating to A & P's ability, in concert with the coconspirators, to effectuate the price fixing plan is again not lacking. The plaintiffs argued that there existed several devices through which the wholesale price of meat was fixed:

(1) Size

The primary thrust of the defendant's argument concerning A & P's alleged inability to fix meat prices is based upon an evaluation of the company's size. Although A & P is the single largest purchaser of carcass beef in the United States, the defendant stresses the fact that it accounted for only 7% to 8% of the total grocery beef sales and

an even lower proportion in total beef sales. The defendant argues that "7% to 8% is clearly not power to fix market prices."

Although it would be convenient if there existed a yardstick for courts to measure the market percentage necessary to control a particular market, the defendant's blatant assertion that 7% to 8% is "clearly" insufficient fails to account for the realities of the modern marketplace. If a market is diverse, a relatively low percentage of total sales may be able to assert sufficient influence to allow regulation of prices. The defendant additionally fails to consider the fact that what is charged in the instant case is a conspiracy between A & P, Safeway, Kroger, and several of the largest retail food chains in the United States.[3] The combined market percentage of these conspirators could, at least, support the conclusion that there existed sufficient economic power to control the wholesale price of beef.

Perhaps a consideration of equal importance to sheer size is the relationship of the large retail stores with their competitors. American Tobacco Co. v. United States, 328 U.S. 781, 796, 66 S.Ct. 1125, 90 L.Ed. 1575 (1945). Kroger, the smallest of the three defendants, is twice the size of the next largest retailer. The remainder of the retail chains named as co-conspirators, all members of the NAFC, represent the largest retail grocery stores in the nation. To argue to the jury that these corporate entities could not have a collectively significant impact on beef prices is certainly proper; to insist that the Court must ignore the jury's verdict and accept the defendant's contentions is untenable.

The question of relative market strength is thus essentially one for the jury. The Court is not in a position to decide as a matter of law that 7% is a "relatively inconsequential market share." The evidence provided the jury

3. Acme Markets, Food Fair Stores, Inc., National Tea Co., First National Stores, Inc., Winn-Dixie Co., Colonial Stores Co., Stop & Shop, Lucky Stores, Jewels Tea, Wakefern Corp., King Soopers Stores, Millers Super Market.

with a complete picture of the beef market, both retail and wholesale; the jury had sufficient information to evaluate the beef market and determine whether or not the defendant, along with the co-conspirators, were able to regulate the market's price structure.

Although the defendant has stressed the insignificance of A & P's share of the market, it additionally argues that size is irrelevant. (Defendant's Reply Brief at 20). As discussed above, the jury must be provided all the information necessary to make an intelligent decision regarding the roles played by the defendant and the co-conspirators. The defendant may not thus consistently argue that, on the one hand, it was too small and then, on the other, that size is irrelevant.

### (2) The NAFC

As noted above, the NAFC was capable of being utilized for other than legitimate purposes. The plaintiffs argued that the Association was ideal for the covert exchange of price information and was a key factor in the furtherance of the conspiracy. Again, although the defendant maintains that the NAFC was not manipulated in such a manner, there was sufficient evidence to support a determination by the jury that the NAFC was playing such a role.

Confronted by a similar situation where an antitrust defendant was a member of a trade association, the Ninth Circuit has stated:

> "It is uncontroverted that this committee held meetings at which Laswell, as well as representatives of the other defendant corporations, was present . . . That an opportunity was thus afforded to discuss and agree upon prices and pricing policies on an industry-wide basis, cannot be denied." C-O-Two Fire Equipment Co. v. United States, 197 F.2d 489, 493 (9th Cir. 1952).

As in the instant case, the *C-O-Two* defendant argued that there was no direct evidence of anything illegal having transpired at the meeting. However, the Court held that the opportunity was a factor supporting the conclusion of the trier of fact that the criminal charges were true beyond any reasonable doubt. A similar conclusion must follow in the instant civil case—the jury could have reasonably concluded that, by a preponderance of the evidence, the NAFC was, or could have been, a vehicle through which the conspiracy was nurtured and implemented.

### (3) Centralized Buying

Although centralized buying, like membership in the NAFC, is not inherently illegal, it may offer a potential for abuse; if a conspiracy exists this type of buying provides a convenient device to effectuate the decision to fix prices.

There was sufficient evidence to support the conclusion that not only A & P, but Safeway and Kroger as well, maintained a buying system whereby beef purchases could be made for the entire chain from one central location. The purchases were made on a national level and enabled the company to select the price it would pay for beef. Local stores within the chain were allowed only a small amount of flexibility in purchasing beef from sources other than the main office. The Court does not wish to condemn this method of purchasing a product; the jury may however, examine the buying system in conjunction with the alleged conspiracy to determine if it was a means to an unlawful end.

### (4) The "Yellow Sheet"

The Yellow Sheet is a publication listing the prices of beef during various time periods. The plaintiffs argued that this publication was a device through which the defendant and the co-conspirators kept informed about meat prices, calculated the prices they would pay, and communicated the amount paid to the other stores. The Yellow Sheet is a further example of an otherwise legitimate endeavor that may be manipulated to exploit an illegal design. It is not the function of this Court to speculate as to the role as-

signed by the jury to the Yellow Sheet. This publication is, however, another tool available to the defendant and the co-conspirators that would facilitate the regulation of beef prices.

(5) Miscellaneous

The four items discussed above are illustrative of the evidence that supports the jury's conclusion that A & P, in concert with the co-conspirators, had the ability to regulate meat prices. There were additional factors—e. g., buying on different days, programs to alleviate oversupply, testimony of the packers that meat prices were dictated by the chains —that also support the conclusion that the defendant had the ability to control meat prices; the defendant's contentions that there was no evidence as to how the alleged agreement to fix prices might have been implemented or that A & P did not have the ability to fix prices are therefore without merit.

### Economic Effects

■ Perhaps the most persuasive evidence presented by the plaintiffs was that concerning the economic effects of the alleged conspiracy. The economics of the beef market are appropriate not only to the damage issue (see damage section, *infra*), but to the question of the existence of the conspiracy itself. See American Tobacco Co. v. United States, 328 U.S. 781, 804, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

The economic theory presented to the jury by the plaintiffs was one based primarily upon the more basic principles of supply and demand. The plaintiffs argued that, had a free market—one unfettered by artificial price fixing mechanisms—been operating the price received by the cattleman would rise as the demand (consumption) exceeded the supply (production); the amount received by the retailer would also rise during a period of high demand. Conversely, prices received by both the cattleman and the retailer should theoretically drop as consumption sagged.

According to the evidence submitted by the plaintiffs (summarized in Exhibits 1–5), during the Korean War the beef market was operating properly. Meat production exceeded meat consumption and the price the cattleman was receiving for his beef was falling. This relationship continued until 1956 when, with production having peaked and beginning to level off, the beef market hit a bottom of approximately 20 cents per pound.

Subsequent to this period, however, there occurred a profound change in the economic picture of the beef industry. In 1957 consumption began to exceed production and prices, for a brief time, began to rise. The gap between consumption and production widened yet the price per pound received by the cattleman dropped (from approximately 26 cents per pound in 1959 to 24 cents per pound in 1961). After a brief rise to 25 cents in 1962, the price per pound again dropped, reaching a low of 22 cents in 1964; yet the consumption of beef had increased from approximately 38 billion pounds in 1962 to 42 billion pounds in 1963, while the production figure in 1963 was only 36 billion pounds. Based upon the plaintiffs' evidence the conclusion could logically be drawn that there existed some external factor influencing the supply-demand relationship; since prices were dropping to the producer in a time of high demand, the market was not operating properly.

That external factor explaining the behavior of the market was, according to the plaintiffs, a conspiracy on the part of beef retailers to keep the wholesale price of meat artificially depressed. At the time that the price received by the cattleman for his beef was paradoxically dropping or levelling off in face of increasing consumption, the gross profit margin of the retailer (*i. e.*, the difference between the price at which the retailer sold the beef and the price he paid for it) was greatly increasing. It thus appears that the retailer was able to take

advantage of the high consumption by selling his beef at higher prices and increasing the difference between the price he paid and the price he received. The testimony of the cattlemen, however, indicated that the price they received was not reflecting the increased consumption and that they were operating at substantial losses.

To further support their contention that there existed a conspiracy by the retailers to artificially depress the wholesale price of beef, the plaintiffs argue that the injunction issued by this Court in 1971 had the effect of terminating (or at least hampering) the conspiracy. The effects of "freeing" the beef market were, according to the plaintiffs, strikingly evident in the price the cattleman began to receive for his beef. Between 1970 and 1973 the price per pound increased from approximately 27 cents to almost 44 cents. The obvious conclusion argued by the plaintiffs was that an unfettered market was attempting to immediately establish price levels commensurate with the supply-demand relationship; having been artificially depressed for a number of years, the wholesale beef prices jumped to all time highs.

■■ The defendant argues that the external factor influencing the market —if such a factor even existed—was not a conspiracy, but could have been any number of other considerations. Additionally the defendant has attacked the validity of the plaintiffs' statistics and has supplied figures of its own that are allegedly more accurate. Yet, at the risk of being redundant, the Court again notes that what the defendant has done is argue that the jury incorrectly interpreted evidence that was before it. Typical of the defendant's argment is the contention that " . . . coupled with the rising retail labor and distribution costs which equalled if not outstripped any increase in their margin, [centralized buying] affords a wholly legitimate explanation for the fact that the retailers' share of the beef dollar has increased." The test applicable to a motion for a judgment n. o. v. is not, however, whether the defendant has offered a "wholly legitimate explanation" to the jury, but whether there is an absence of credible evidence supporting the plaintiff's case, Continental Ore v. Union Carbide and Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). Similarly, the defendant's contentions that the plaintiffs' statistics do not take into account imported cattle or weekend specials are arguments that were and should be made to the jury. The evidence presented by the plaintiffs provides a triable issue of fact; the defendant's own expert stated that, although the economic evidence was not absolute proof, it did raise questions about whether the beef prices were being governed by supply and demand. (RT: 3048–49). It is the jury's obligation to resolve such questions.

*Conclusion—conspiracy*

As is usual in cases such as this, there exists no proof of a formal agreement between A & P and the co-conspirators; the plaintiffs' case is undoubtedly circumstantial. Yet, the law contemplates that seldom will direct proof of a conspiracy be available. C-O-Two Fire Equipment Co. v. United States, 197 F. 2d 489, 494 (9th Cir. 1952). Accordingly, circumstantial evidence—even in a criminal case—provides a sufficient basis to support a determination of liability. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 221, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

■ Having reviewed the evidence the plaintiffs have presented, the Court is of the opinion that this evidence is sufficient to support the conclusion that a conspiracy did exist between the defendant and the co-conspirators. The Court cannot isolate pieces of evidence; nor can it speculate as to how the jury analyzed a particular problem. The Court has not discussed all the evidence that was presented; nor have all possible theories been explored. Yet, taken as a whole, and in a light most favorable

to the verdict, the evidence refutes the defendant's contention that there was no basis upon which the jury could have concluded that there was an agreement to regulate beef prices between the defendant and the co-conspirators. See Continental Ore v. Union Carbide and Carbon Corp., *supra,* 370 U.S. at 690, 82 S.Ct. 1404; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Estate of William Le Baron v. Rohm & Haas Co., 441 F.2d 575 (9th Cir. 1971).

B. Relevance of retail price fixing: The defendant contends that all evidence relating to retail prices was irrelevant and prejudicial. To prevent the jury from hearing evidence concerning retail price fixing would, however, have irrationally segmented the defendant's behavior into artificial compartments. The jury should not be forced to examine the conspiracy in a vacuum; the evidence relating to retail prices allowed the jury to scrutinize the behavior of the defendant in its entirety and understand the intent, motive, and method behind its activities. Continental Ore Co. v. Union Carbide and Carbon Corp., *supra,* 370 U.S. at 699, 82 S.Ct. 1404. The defendant's contention that retail prices have no relationship to wholesale prices defies not only common sense, but the testimony of A & P's Chairman of the Board (RT: 514); the argument also defies the principle that the "trial court has a wide discretion in the admission of evidence which even remotely tends to establish conspiracy." Flintkote Company v. Lysfjord, 246 F.2d 368, 378 (9th Cir. 1957).

II. *Damages*

A. Proximate cause: It is the defendant's contention that the plaintiffs occupied "an incidental or remote" position in relation to the activities of the retail grocery chains. This argument is predicated primarily upon the fact that the packer occupied a position between the cattleman and the retailer. The cattleman sold his product, not directly to A & P, but to a packer who slaughtered, dressed, and packed the beef; the beef was then sold to the retailer by the packer.

The defendant is unquestionably correct when it states that " . . . Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Hawaii v. Standard Oil Co., 405 U.S. 251, 262–3, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The plaintiffs, in order to recover, must prove a causal connection between the violation and the injury; additionally the plaintiffs must be in the "target area" of the conspiracy. Contreras v. Grower Shipper Vegetable Association, 484 F.2d 1346 (9th Cir. 1973).

The target area approach requires that a plaintiff suffer losses "within that area of the economy which is endangered by a breakdown of competitive conditions in a particular industry." In Re Multidistrict Vehicle Air Pollution, 481 F.2d 122, 129 (9th Cir. 1973). Recovery under the Sherman Act must thus be preceded by an examination of the area of economy affected by the violation.

It should be noted at the outset that the Ninth Circuit has specifically held that the mere presence of an intermediary between the plaintiff and the defendant would not require a finding of lack of injury. In Re Multidistrict Vehicle Air Pollution, *supra* at 128. See also Perkins v. Standard Oil Co., 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969). It is the economic area in which the plaintiff is damaged that is the crucial factor—not an artificial limitation based upon the number of links in the chain of distribution.

In the instant case the packer does not interrupt the direct flow of goods from the cattleman to the retailer; the packer is merely the middleman who passes the product from the producer to the retailer. The defendant's constant stress upon the change the beef undergoes from cattleman to retailer is a literal application of form over sub-

stance. Although the form of the product is altered somewhat as it goes from cattleman to retailer, the basic item is essentially the same. This is not a case of being unable to trace an ingredient from supplier to manufacturer to distributor to retailer. See, *e. g.*, Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). Nor are the plaintiffs in the instant case merely peripheral parties, such as workers who allege that, due to the defendant's antitrust violations in fixing prices, they have been deprived of employment. See Contreras v. Grower Shipper Vegetable Association, *supra.* The product involved throughout the instant transactions is beef. The packer, according to the plaintiffs' theory, merely passed along the fixed, depressed price of beef forced upon him to the helpless cattleman. The economic area affected by the defendant's conspiracy is beef; the competition to be furthered by the Sherman Act is that between retail grocers themselves, thereby allowing the cattleman to receive a fair price for the beef he produces. The plaintiffs thus have suffered losses that fall directly within the target area—it was the beef market that the defendant regulated and it is the beef market in which the plaintiffs suffered their losses.

Similarly, the defendant's insistence that the plaintiffs are attempting to recover for wrongs dealt the packers is short-sighted. The plaintiffs presented evidence that the prices charged the packers were dictated by the retailers and directly resulted in the lower prices the cattleman was receiving for his product. The only evidence of culpability applied to the conspirators—not the packers—and that evidence supports the conclusion that the packers were merely tools utilized by the conspirators to artificially depress beef prices. There can be little doubt that the foreseeable consequences of the defendant's actions would directly affect the operations of the cattleman; indeed, it is the cattle-

man who would ultimately have the most to lose from such a conspiracy. See Twentieth Century Fox Corp. v. Goldwyn, 328 F.2d 190, 220 (9th Cir. 1964).

■ B. Proof as to damages: The defendant argues that there existed insufficient evidence to support the damages awarded by the jury. The initial contention of the defendant—that there was no proof any cattle sold by the plaintiffs found their way into any A & P store—is correct. However, that lack of proof is not fatal to the plaintiffs' case. The theory presented to the jury by the plaintiffs was based upon the defendant's ability—in conjunction with its co-conspirators—to control the price of beef, both at the retail and wholesale levels. As discussed above, there was sufficient proof that the conspirators had not only the ability to artificially depress meat prices, but in fact did dictate to the packer and the cattleman the price that would be paid for beef. The result was a "funnel" effect; the beef produced by the plaintiffs had to be distributed through the retail market yet, because of the conspirators' pervasive dominance in the market, the prices the plaintiffs received were prices dictated by the retailers. The result of the conspirators' influence in the meat industry was a market wide depression of wholesale beef prices. As detailed in Exhibits 1–5, during the time period in question the price received by the cattlemen across the nation remained essentially stagnant while the consumption of beef was greatly increasing. See Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123–4, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).

The evidence introduced by the plaintiffs describes national market conditions between 1951 and 1973. It would appear that, regardless of to whom a cattleman sold his beef, he would be affected by the conspiracy. Thus the lack of proof that A & P did not buy any of the plaintiffs' cattle is essentially irrelevant; there was sufficient evidence that

the plaintiffs sold cattle in a market at prices depressed due to the acts of the defendant. It was the defendant who created an environment into which the plaintiffs were forced to sell their wares. See Wall Products Co. v. National Gypsum Co., 357 F.Supp. 832, 840 (N.D.Cal.1973). That this economic manipulation had a direct adverse effect on the plaintiffs—cattlemen attempting to sell in a depressed market—is obvious.

 The defendant additionally contends that the damages assessed by the jury were unsupported by the evidence and the amount of the verdict was "monstrous". There is no doubt that the award was a large one. However, if the damages were calculated according to a reasonable evidentiary foundation, the mere size of the verdict will not prevent recovery. *Cf.* Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709 (9th Cir. 1960), cert. denied 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543.

 It would appear the the jury calculated the damages by finding that, had there not been a conspiracy, the plaintiffs would have received 20 cents per pound more than they actually did receive. The damages were thus calculated by multiplying the total number of pounds sold by each plaintiff between 1964 and 1967 by 20 cents. Such a method of calculation is certainly proper —if the 20 cent figure is a reasonable one. See, *e. g.*, Wall Products Co. v. National Gypsum Co., *supra.* The validity of the 20 cent figure, characterized by the defenant as "simply a figure pulled out of thin air", is thus the key to resolution of the damage issue.

The jury had before it evidence that, between 1953 and 1970, the price received by the cattleman for his cattle remained relatively constant—between 20 and 28 cents per pound. Between 1970 and 1973—a time period the conspiracy was allegedly inoperative—the price of beef skyrocketed to 43 cents per pound. The jury apparently concluded that, had the conspiracy not been in effect in 1964–1967 a similar increase of approx-

imately 20 cents per pound would have occurred.

The 20 cent figure is undoubtedly an average; the plaintiffs are not, however, required to prove damages with mathematical certainty. Richfield Oil Corp. v. Karseal Corp., 271 F.2d 709 (9th Cir. 1959). Indeed, in a case such as this—where a national market has been manipulated for a number of years —precise assessment of what the plaintiffs would have received had there been no conspiracy is impossible. The jury utilized an appropriate device to assist it in its determination of damages; it reviewed the effect on prices at the time the conspiracy terminated and compared those prices with market conditions during the conspiracy. To require a more specific standard of accounting would allow the defendant to benefit from its own wrongdoing; it was the defendant's successful control of the market that eliminated a most precise method of calculation. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264–5, 66 S.Ct. 574, 90 L.Ed. 652 (1946).

The defendant argues further that the across the board 20 cent figure fails to take into account the prices actually received by the plaintiffs and ignores price fluctuations due to differences in time, location, quality, and type. There can be little doubt that the damage figure was based upon evidence reflecting national averages. However, when the national averages are compared with the prices actually received by the plaintiffs, it is apparent that the averages are representative within tolerable limits and are appropriate to utilize as standards for projection. The Court does not expect the plaintiffs to prove the exact loss suffered on each sale; as noted above, such a requirement would place upon the plaintiffs an impossible burden. The 20 cent figure constitutes an average flexible enough to account for the variations discussed by the defendant.

The jury must "make a just and reasonable estimate of the damage based

upon relevant data, and render its verdict accordingly." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946). Considering the type of conspiracy involved, the jury has performed this very function.

 C. Compton's damages: One of the plaintiffs, Compton, arguably presents a special problem in the damage area. Compton, in addition to raising cattle himself, operated a feedlot. The feedlot operation involved the purchase of cattle from cattlemen, some of them being other plaintiffs, for the purpose of preparing the livestock for slaughter (i. e., fattening the animals). The defendant argues that to permit Compton to recover would allow not only a double recovery against the defendant, but would permit Compton to recover for losses he could have passed to the actual producers.

The defendant's thesis is based upon the argument that, assuming Compton was selling his livestock to the packers at an artifically low price, he was also purchasing his cattle from the cattlemen at a low price. This type of an argument is, however, in all essential respects a "passing on" defense—a defense that has been rejected by the United States Supreme Court. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In the *Hanover Shoe* situation, the defendant argued that the plaintiff did not suffer any actual damage since any illegal overcharge was reflected in the price charged by Hanover to its customers. The Court held, however, that "as long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower." Hanover Shoe, Inc. v. United Shoe Machinery Corp., *supra* at 489, 88 S.Ct. at 2229.

In the instant case Compton is simply at the other end of the market spectrum.

Instead of buying at an illegally high price from the antitrust violator and selling to his customers at a correspondingly higher price, Compton is forced to sell at an illegally low price after having purchased the product in a market that is correspondingly low. Because of the conspiracy Compton received less for his beef; the fact that he purchased the beef from a third party instead of raising it himself will not prevent his recovery.

## MOTION FOR A NEW TRIAL

The defendant maintains that many of the arguments presented in support of its motion for a judgment n. o. v. apply equally to the motion for a new trial. The Court, cognizant of the different standards pertaining to a motion for a new trial, must deny the motion as it relates to those contentions for the same reasons discussed above. The defendant additionally argues that it is entitled to a new trial because of errors made by the Court in (1) admitting certain evidence and (2) instructing the jury.

### I. *Evidentiary objections*

#### (1) Admissions of co-conspirators

 The defendant argues that statements made by NAFC members at meetings not attended by A & P constitute inadmissible hearsay. The contention of the defendant is that there was insufficient evidence establishing the prima facie case of A & P's knowing participation in any conspiracy that would be a prerequisite to the admission of the statements or acts of co-conspirators. Flintkote Co. v. Lysfjord, 246 F. 2d 368, 378 (9th Cir. 1957).

The Court has previously outlined briefly some of the evidence that tends to support the existence of a conspiracy to regulate prices. Much of that evidence is not based upon acts of alleged co-conspirators and thus provides a basis upon which a prima facie case may be established. See e. g., Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 249, 38 S.Ct. 65, 62 L.Ed. 260 (1917). It

should additionally be noted that the evidence establishing the prima facie case need not be introduced prior to the admission of the statements of the co-conspirators. Flintkote Co. v. Lysfjord, *supra* at 378. The Court is thus satisfied that the "independent evidence" requirement has been met and the evidence relating to the co-conspirators properly admitted.

### (2) Exhibit 151

 Exhibit 151 contains the type and amount of beef sold by each of the plaintiffs. The top sheet of the exhibit, to which the defendant objects, gives the amount of livestock sold by each plaintiff in terms of total quantity sold and pounds sold. This information in no way misled the jury nor was it prejudicial to the defendant; the exhibit was properly admitted into evidence.

### (3) Evidence of events prior to and subsequent to the conspiracy

 The defendant argues that the Court improperly admitted evidence concerning events occurring before A & P joined the NAFC and evidence covering a period subsequent to that time embraced by the lawsuit. The evidence admitted over the defendant's objection is relevant to understanding the nature and extent of the conspiracy; as the Court noted above, the activities of the defendant and the co-conspirators cannot be viewed in a vacuum. Federal Trade Commission v. Cement Institute, *supra*, 333 U.S. at 705, 68 S.Ct. 793.

### (4) Miscellaneous

The defendant raises a number of other evidentiary points, discussed in varying degrees of detail, in support of its motion for a new trial. After having examined the defendant's contentions, the Court is satisfied that its original rulings were correct and the evidence properly admitted.

### II. *Objections to Instructions*

### (1) Assumption of injury

 The defendant contends that the instructions "assumed the existence of injury to plaintiffs' business or property." The Court, however, specifically informed the jury that "[t]he fact that I am instructing you on the subject of damages does not mean that I am of the opinion that any plaintiff is, or is not entitled to recover damages in this case. I am expressing no opinion on that subject in one way or another." (RT: 3636). The instructions were abundantly clear that only the jury could determine if an injury occurred.

### (2) Reference to Safeway and Kroger settlements

 The defendant argues that the Court's instructions relating to the Safeway and Kroger settlements implied that these two defendants had acknowledged guilt. The defendant has again conveniently omitted a key part of the instruction that was actually given:

"The agreement or stipulation states that plaintiffs have at no time contended that the defendants had any express agreement with any other defendants to fix prices or otherwise violate the antitrust laws and plaintiffs have discovered no facts indicating such an express agreement . . .

"It was further stipulated that nothing contained in the agreement could be deemed as an admission of either defendant of any of the charges made in the complaint." (RT: 3614–5)

The Court's charge reflected the stipulation accurately and in no way prejudiced the defendant.

### (3) Judicial notice of prior judgments

 The Court indicated to the jury that on three previous occasions the defendant A & P had utilized its market power to gain a financial advantage. The three cases cited by the Court all involved the use of A & P's size to violate the antitrust laws. The plaintiffs were entitled to prove past abuse of buying power and the instruction given accomplished this is a manner that minimized the prejudice to the defendant. See United States v. Paramount Pictures, Inc., 334 U.S. 331, 68 S.Ct. 915, 92

L.Ed. 1260 (1948); American Tobacco Co. v. United States, 328 U.S. 781, 66 S. Ct. 1125, 90 L.Ed. 1575 (1946). The defendant has strenuously argued that A & P was incapable of fixing the market because its total percentage of the market was so small. The abuse of buying power cited by the Court allowed the jury to consider that argument against the background of events of which the Court may properly take judicial notice (*i. e.*, judicial proceedings).

(4) Miscellaneous

The defendant argues a number of other contentions relating to the jury instructions; the Court considers these arguments to be without merit and its original rulings correct.

Accordingly, it is ordered that the defendant's motion for judgment n. o. v. or, in the alternative, a new trial be, and the same is, hereby denied.

## PLAINTIFFS' MOTIONS FOR INJUNCTIVE RELIEF AND MAINTENANCE OF A CLASS ACTION, AND FOR ATTORNEY'S FEES

Subsequent to the jury's verdict awarding the plaintiffs $10,904,027 in this antitrust action, the plaintiffs made motions for injunctive relief and attorney's fees, and renewed their motion for maintenance of a class action.

*Motion for Injunctive Relief*

The plaintiffs' motion for injunctive relief requests that the Court make the following orders:

(1) Require A & P to purchase its meat requirements on a store-by-store basis;

(2) Prevent A & P from exchanging price, supply, cost and/or margin information about meat products among and between its stores;

(3) Prevent A & P from exchanging price, supply, cost, and margin information about meat products with any of its competitors, including the NAFC and any of its members;

(4) Prevent A & P from meeting, corresponding, telephoning, or communicating, in any fashion, with any of its competitors where the subjects of price, supply, cost and/or margins on meat products is discussed;

(5) Prevent A & P from utilizing the National Provisioner and/or "Yellow Sheet" in making its determination of the price to be paid for the purchase of meat products;

(6) Prevent A & P from making any of its purchases of meat products on Mondays or Tuesdays;

(7) Prevent A & P from "integrating backwards" into the processing, packing, or butchering of any meat products;

(8) Require A & P to divest itself of certain store divisions.

It is clear from a reading of the above "suggestions" for injunctive relief that the plaintiffs are seeking rather drastic equitable remedies. The plaintiffs are requesting that the Court essentially dismantle A & P's extensive retail system, monitor communications, not only between A & P and its competitors, but between stores within the A & P chain itself, and prevent A & P from engaging in certain activities which, if utilized properly, result in lower prices to the consumer without illegally affecting the price received by the cattleman. The injunctive relief requested by the plaintiffs is thus not only overbroad, it borders upon the impractical—what the plaintiffs propose is more a legislative plan designed to deal with the cattleman's problems in the meat industry.

The Court does not wish to either impugn the jury's verdict or minimize the seriousness of the defendant's conduct; the verdict and the evidence indicate that A & P, along with the co-conspirators, were responsible for serious damages to the plaintiffs and the American meat industry. However, neither the severity of the damage nor the amount of the verdict automatically requires that the Court grant injunctive relief; there exist certain requirements independent of the jury verdict which must be met. See, *e. g.,* Zenith Radio

Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); United States v. National City Lines, Inc., 134 F.Supp. 350 (N.D.Ill. 1955). In the instant case there are three of these requirements that the plaintiffs have failed to adequately address: a continuing threat; convenience and effectiveness of administration; and balancing of public interest.

### Continuing threat

■ The plaintiffs face a substantial evidentiary burden in demonstrating that there exists a continued threat of danger in the future as a result of an ongoing violation of the antitrust laws. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). A key contention made by the plaintiffs at the trial was that the conspiracy ended in the period subsequent to the filing of the lawsuit. There is, of course, the possible danger that the conspiracy could be renewed at some future date; however, the Court has been provided with no evidence that A & P presents such a continuing threat to the plaintiffs. The plaintiffs have thus failed to meet their "heavy burden of persuasion" in seeking the injunctive relief. See Citizen's Committee for Hudson Valley v. Volpe, 297 F.Supp. 804 (S.D.N.Y.1969).

It should be noted that many of the activities the plaintiffs seek to enjoin are not inherently illegal. Absent the strong showing that these activities (e. g., centralized buying, use of the "Yellow Sheet", buying on different days) will continue to be abused in the future, the Court is not in a position to enjoin an otherwise legitimate activity. The jury had sufficient evidence to conclude that certain of these activities had been abused; this conclusion does not, however, mandate that an injunction should issue preventing the defendants from using the activities in an otherwise legal manner.

### Convenience of administration

■ The burden placed upon the Court if it decided to issue the injunc-

tion sought by the plaintiffs would be extremely heavy. This Court would have the responsibility of not only reorganizing a large corporation, but regulating conduct between A & P and its competitors and scrutinizing the internal operations of the corporation. It has long been settled that a court shall not issue an injunction that would be inconvenient or inefficient to administer. The Salton Sea Cases, 172 F. 792 (9th Cir. 1909), cert. denied 215 U.S. 603, 30 S.Ct. 405, 54 L.Ed. 345 (1909). See 7 Moore, Federal Practice, ¶ 65.18(3)· (2d ed. 1974).

### Public Interest

■ In determining the appropriateness of injunctive relief, a court must balance not only the relative benefits and hardships between the parties, but also consider the public interest in general. Walling v. Brooklyn Braid, 152 F. 2d 938 (2d Cir. 1946); Citizen's Committee for Hudson Valley v. Volpe, *supra*. The Supreme Court has indicated that the availability of injunctive relief should be "conditioned by the necessities of the public interest which Congress has sought to protect." Hecht Co. v. Bowles, 321 U.S. 321, 330, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). In the instant case the injunctive relief sought possibly assists the cattleman in obtaining a high price for his product. However, by preventing the defendant from engaging in activities that are not inherently illegal, A & P is placed at a serious disadvantage in the marketplace. Furthermore, adoption of the sanctions sought could easily result in higher meat prices for the consumer. The result could be, not competition, but another fixed market—this time in favor of the cattleman. The Court thus considers any advantage attaching to the requested injunctive relief outweighed by the harm to the public interest in general.

### Motion for Maintenance of Class Action

■ The plaintiffs have moved the Court to rule that this action be maintained as a class action. Cattlemen

throughout the nation have submitted affidavits in which they state that they were damaged between the years 1964 and 1967 as a result of the defendant's antitrust violations.

The complaint was filed in this action on January 17, 1968, but contained no mention of a class action. In 1970 the plaintiffs filed a motion to amend the complaint to include class action allegations. This Court, on October 7, 1970, specifically denied with prejudice the plaintiffs' motion to amend. Although the plaintiffs contend that the Court's 1970 order denied the motion to amend only as to the proposed monopoly allegations, the order specifically refers to "allegations that the above entitled action was brought as a class action."

The Court did subsequently indicate that it would reconsider the motion to amend at a later time. The Court additionally stated that it had the power to declare a class at any time—even after a verdict had been returned and a judgment entered. This clarification of the Court's power to create a class was not, however, a determination of the merits of the plaintiffs' motion to amend.

After the jury's verdict was rendered the plaintiffs did submit arguments on the class action motion. These arguments were not, however, directed at the issue of why the Court should reverse its original ruling, but instead discussed the merits of the class action itself. The plaintiffs have failed to present to the Court any compelling reason to reverse its original decision.

The Court, having ruled once on the matter, can discern no reason to overturn its original opinion. Indeed, the vast scope of the plaintiffs' motion—creating a class that would involve billions of dollars worth of claims—requires that the Supreme Court's admonition that class actions be maintained as soon as practicable be carefully followed. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). The Court considered the plaintiffs' attempt to amend the complaint in 1970 to be un-

timely; absent reasons not presented to the Court at that time as to the propriety of amending the complaint to allege a class action, the Court will again refuse to permit the plaintiffs to argue the class action issue.

*Application for Attorney's Fees*

The plaintiffs have requested that the Court award attorney's fees in the amount of 20–25% of the $32,712,081 trebled verdict. The defendant opposes the motion, taking the untenable position that the plaintiffs' contingent fee arrangements with their counsel constitute sufficient compensation and the Court should therefore award no attorney's fees.

The Court considers it appropriate to adopt a position somewhere between those of the parties. The flat percentage basis urged by the plaintiffs is an artificial device which provides little assistance in setting a reasonable fee in a case of this magnitude; the defendant's position that the plaintiffs are entitled to no award of attorney's fees is nothing short of ludicrous. There exist several factors which must be analyzed in reaching a conclusion as to a reasonable fee:

(1) magnitude and complexity of the litigation;

(2) responsibility undertaken;

(3) time and labor spent;

(4) amount recovered;

(5) standing of counsel.

Hanover Shoe, Inc. v. United Shoe Machinery Corp., 245 F.Supp. 258, 302–3 (M.D.Pa.1965); Bal Theatre Corp. v. Paramount Film Distributing Corp., 206 F.Supp. 708, 715 (N.D.Cal.1962). Evaluation of these standards indicates that the plaintiffs are entitled to substantial attorney's fees, although an amount much less than requested.

*Magnitude and complexity of litigation*

That the magnitude and complexity of this case was significant is demonstrated by the sheer physical dimensions of

the trial. There were 3698 pages of transcript and over 150 plaintiffs' exhibits covering a period of eight trial weeks.

Yet, even aside from the physical aspects of the preparation and presentation of the case, the issues tried were of such a nature that the plaintiffs were confronted by a heavy evidentiary burden. The plaintiffs charged a conspiracy which resulted in a nationwide depression of wholesale meat prices. The damages alleged were due to an artificial depression of an entire wholesale market—a relatively unique and awesome charge. Complicating the issue even further was the presence of the packer between the cattleman and the retailer in the chain of distribution. The plaintiffs were additionally confronted by the defendant's constant insistence upon secrecy. The conspiracy alleged was not only of national proportions, but was in effect for a great number of years. The plaintiffs had the benefit of no prior judgments and, as noted above, many of the issues were of a unique nature. All of these factors contribute to the inexorable conclusion that this case is one of great magnitude and complexity.

### Responsibility undertaken

In the analysis of this fee question the plaintiffs must receive high marks for the responsibility undertaken. The plaintiffs took on the powerful retail grocery industry and charged them with a long term conspiracy to fix both the wholesale and retail prices of meat. That competition in this economic area is of crucial importance cannot be gainsaid; the vitality of the food industry is of great national concern.

### Time and labor spent

The plaintiffs estimate that seven attorneys spent from 7462–8000 hours working on this case. Although the representations made by the plaintiffs' counsel appear to be no more than estimates, there can be little doubt that substantial time was devoted to the preparation and presentation of this case.

The Court would additionally note that strict application of "customary charges" or "going rates" is not appropriate in the instant case. See Hanover Shoe, Inc. v. United Shoe Machinery, Inc., supra at 303. It is clear from the above discussion that this is not a "customary" case. Thus the defendant's mechanical application of standard hourly rates is not appropriate; utilization of such a method of computation would ignore other factors essential to a determination of what would be a reasonable fee.

### Amount received

There is certainly some correlation between the fee to be awarded and the amount of the verdict, Bal Theatre Corp. v. Paramount Film Distributing Corp., supra at 718, and the total award in the instant case of $32,712,081 is obviously an extremely large one. It is due partially to this large verdict that a flat percentage basis of calculation is inappropriate. The cases cited by the plaintiffs and frequently utilized by courts in determining the reasonableness of fees all involve verdicts substantially less than the one in the instant case; the percentages involved in these cases thus provide little assistance in calculating the fee in the instant case. Yet the size of the verdict is indicative of the work involved in the presentation of the case and is thus a consideration in the awarding of a fee.

### Standing of counsel

Counsel for both the plaintiffs and the defendant occupied positions of high standing in the legal community. The law firm representing the plaintiffs is one of the most skilled and reputable antitrust firms in the nation.

After having considered the above factors, the Court believes that the plaintiffs should be awarded attorney's fees in the sum of $3,200,000. Such a figure is reasonable in light of the significance of the litigation and the amount of work involved in prosecuting the case. In viewing this figure in

terms of percentage, after having considered the factors discussed above, it represents approximately 10% of the trebled verdict. In light of the large verdict rendered, such a percentage is not unreasonable.

Accordingly, it is ordered that the plaintiffs' motion for injunctive relief be, and the same is, hereby denied.

It is further ordered that plaintiffs' motion to maintain a class action, be, and the same is, hereby denied.

It is further ordered that plaintiffs' application for attorney's fees be, and the same is, hereby granted and plaintiffs shall be awarded attorney's fees in the amount of $3,200,000.