In re BEEF INDUSTRY ANTITRUST LITIGATION, MDL DOCKET NO. 248.

PONY CREEK CATTLE CO., INC., et al., Plaintiffs-Appellants,

Musselman Ranch Co., etc., et al., Plaintiffs-Intervenors-Appellants,

v.

The GREAT ATLANTIC & PACIFIC TEA CO. et al., Defendants-Appellees.

R. Dirk AGEE et al., Plaintiffs-Appellants,

v.

SAFEWAY STORES, INC., et al., Defendants-Appellees.

MEAT PRICE INVESTIGATORS ASSOCIATION, etc., et al., Plaintiffs-Appellants,

v.

SAFEWAY STORES, INC., et al., Defendants-Appellees.

Richard S. LOWE et al., Plaintiffs-Appellants,

v.

SAFEWAY STORES, INC., et al., Defendants-Appellees.

A. L. BLACK et al., Plaintiffs-Appellants,

v.

ALBERTSON'S, INC., et al., Defendants-Appellees (two cases).

CHAPARRAL CATTLE CORP., et al., Plaintiffs-Appellants,

v.

SAFEWAY STORES, INC., et al., Defendants-Appellees.

Burke PETERSEN et al., Plaintiffs-Appellants,

v.

SAFEWAY STORES, INC., et al., Defendants-Appellees.

Ronald BECKER et al., on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellants,

v.

SAFEWAY STORES, INC., et al., Defendants-Appellees.

John O. VARIAN et al.,
Plaintiffs-Appellants,

v.

SAFEWAY STORES, INC., et al.,
Defendants-Appellees.

MEAT PRICE INVESTIGATORS ASSO-
CIATION et al., Plaintiffs-Appellants,

v.

SAFEWAY STORES, INC., etc., et al.,
Defendants-Appellees.

LITTLE RANCH CO., INC., et al.,
Plaintiffs-Appellants,

v.

The NATIONAL ASSOCIATION OF
FOOD CHAINS, etc., et al.,
Defendants-Appellees.

Ronald BECKER et al., on behalf of them-
selves and all other persons similarly
situated, Plaintiffs-Appellants,

v.

SAFEWAY STORES, INC., etc., et al.,
Defendants-Appellees.

Nos. 78–1817—78–1829.

United States Court of Appeals,
Fifth Circuit.

Aug. 17, 1979.

Ben L. Krage, Kasmir, Willingham & Krage, Dallas, Tex., for Pony Creek, et al.

Lowell V. Summerhays, Robinson, Guyon, Summerhays & Barnes, Salt Lake City, Utah, for Varian, et al., Chaparral Cattle Corp., et al. and Petersen, et al.

Robert R. Eidsmoe, Gleysteen, Harper, Kunze, Eidsmoe & Heidman, Sioux City, Iowa, Burt A. Braverman, Frances Chetwynd, Washington, D. C., for Lowe, et al.

Lex Hawkins, Glenn L. Norris, Hawkins & Norris, Des Moines, Iowa, John A. Cochrane, Cochrane & Bresnahan, St. Paul, Minn., for Meat Price Investigators Ass'n, et al. and Becker, et al.

James W. Witherspoon, Donald L. Davis, Witherspoon, Aikin & Langley, Hereford, Tex., for Black, et al.

Joseph M. Alioto, Steven J. Cannata, Law Offices of Joseph L. Alioto, San Francisco, Cal., for Little Ranch Co.

W. Randolph Elliott, Baker, Glast, Riddle, Tuttle & Elliott, Dallas, Tex., for intervenors—Powell Cattle Co., et al.

Jess B. Hawley, Jr., Hawley, Troxell, Ennis & Hawley, Boise, Idaho, for Albertson's, Inc., Skaggs-Albertson's.

Sheldon S. Toll, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for Allied Supermarkets, Inc.

Benjamin M. Quigg, Jr., Stephen W. Armstrong, James J. Rodgers, Morgan, Lewis & Bockius, Philadelphia, Pa., H. Dudley Chambers, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for American Stores Co. f/k/a Acme Markets, Inc.

Roy Lewis Shults, Mitchell, Silberberg & Knupp, Los Angeles, Cal., for Arden-Mayfair, Inc.

Sylvan Rapaport, c/o Borman's, Inc., Detroit, Mich., for Borman's, Inc.

George B. Haley, Jr., Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., Robert W. Coleman, Stalcup, Johnson, Meyers & Miller, Dallas, Tex., for Colonial Stores, Inc.

John D. Leech, Calfee, Halter & Griswold, Cleveland, Ohio, for First Nat. Stores, Inc.

David A. Rosen, Stein, Rosen & Ohrenstein, New York City, for Food Fair Stores, Inc.

H. Kenneth Kudon, Danzansky, Dickey, Tydings, Quint & Gordon, Washington, D. C., for Giant Food, Inc.

Kenneth A. Plevan, Skadden, Arps, Slate, Meagher & Flom, New York City, for The Grand Union Co.

Wilson W. Herndon, Strasburger & Price, Dallas, Tex., for Liaison Counsel.

Denis McInerney, Thomas F. Curnin, Cahill, Gordon & Reindel, New York City, for The Great Atlantic & Pac. Tea Co., Inc.

Theodore A. Groenke, Walter M. Jones, McDermott, Will & Emery, Chicago, Ill., for Jewel Companies, Inc.

Alexander E. Bennett, Norman Diamond, Washington, D. C., Wilson W. Herndon, Strasburger & Price, Dallas, Tex., for The Kroger Co.

Arnold M. Lerman, C. Loring Jetton, Jr., Wilmer, Cutler & Pickering, Washington, D. C., Jerry L. Buchmeyer, Thompson, Knight, Simmons & Bullion, Dallas, Tex., for Lucky Stores, Inc.

James F. Rill, Martin A. Rosen, Collier, Shannon, Rill, Edwards & Scott, Washington, D. C., John L. Hauer, Richard C. Levin, Akin, Gump, Hauer & Feld, Dallas, Tex., for The Nat. Ass'n of Food Chains.

Jeffrey S. Davidson, Fred H. Bartlett, Jr., Daniel Edelman, Kirkland & Ellis, Chicago, Ill., for Nat. Provisioner, Inc.

Franklin P. Auwarter, Kenneth J. Jurek, Mayer, Brown & Platt, Chicago, Ill., for National Tea Co.

Peter D. Standish, Weil, Gotshal & Manges, New York City, for Pueblo Intern., Inc.

Les J. Weinstein, Aaron M. Peck, McKenna & Fitting, Los Angeles, Cal., for Ralph's Grocery Co.

Richard W. Odgers, John B. Bates, Pillsbury, Madison & Sutro, San Francisco, Cal., W. B. West, III, William F. Carroll, Clark, West, Keller, Sanders & Butler, Dallas, Tex., for Safeway Stores, Inc.

Michael R. Murphy, Donald B. Holbrook, Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, for Skaggs Companies, Inc., Skaggs-Albertson's.

Robert D. Paul, Goodwin, Proctor & Hoar, Boston, Mass., Stanley E. Neely, Locke, Purnell, Boren, Laney & Neely, Dallas, Tex., for The Stop & Shop Companies, Inc.

Geoffrey M. Kalmus, Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, T. L. Caudle, III, Coke & Coke, Dallas, Tex., for Supermarkets General Corp.

Michael E. Bress, Dorsey, Windhorst, Hannaford, Whitney, Halladay, Minneapolis, Minn., for Super Valu Stores, Inc.

Timothy J. Sargent, Bodkin, McCarthy, Sargent & Smith, Los Angeles, Cal., for Thriftmart, Inc.

Ronald L. Olson, Munger, Tolles & Ricker-Hauser, Los Angeles, Cal., for Vons Grocery Co.

Chester Bedell, John A. DeVault, III, Charles P. Pillans, Bedell, Bedell, Dittmar & Zehmer, Jacksonville, Fla., Charles P. Storey, John K. DeLay Jr., Storey, Armstrong, Steger & Martin, Dallas, Tex., for Winn-Dixie Stores, Inc.

Before WISDOM, HILL, and FAY, Circuit Judges.

WISDOM, Circuit Judge:

These consolidated appeals involve the applicability of *Illinois Brick Co. v. Illinois*, 1977, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, to sales by primary producers to middlemen at prices allegedly depressed by price-fixing at the retail level of distribution. The appeals also present other difficult questions concerning federal antitrust laws.

These appeals arise from thirteen private antitrust actions alleging that the concerted activities of the defendants violate the provisions of §§ 1 and 2 of the Sherman Anti-

trust Act, 15 U.S.C. §§ 1 and 2. The complaints ask for treble damages and for injunctive relief under §§ 4 and 16 of the Clayton Act, 15 U.S.C. 15 and 26. The plaintiffs are cattlemen, ranchers, and feeders. The defendants are twenty-five retail food chains, a wholesale grocer, the retail chains' national trade association, and a beef industry price reporting publication.[1] The plaintiffs in the various suits charge that the retail chains combined, primarily by using the trade association and the price reporting publication, to fix at artificially low levels the prices at which beef is purchased from slaughterhouses and meat packers, and ultimately from the producers—cattle ranchers and feeders. The resulting depression in wholesale prices to retailers, passed up the chain of distribution, reduced the prices which the plaintiffs received in selling their cattle to the packers and slaughterhouses.

The Judicial Panel on Multidistrict Litigation assigned the cases to the District Court for the Northern District of Texas, for coordinated or consolidated pretrial proceedings. *In re Beef Industry Antitrust Litigation*, 419 F.Supp. 720 (Jud.Pan.Mult. Lit., 1976). In June 1977 the Supreme Court handed down its decision in *Illinois Brick*, holding that a purchaser could not maintain an antitrust damage action against a seller remote from him in the chain of distribution; rejecting, with narrow exceptions, the offensive use of "passing-on".[2] Shortly thereafter the defendants moved for dismissal of the complaints on the ground that the plaintiffs' theory of damages (sellers suing remote purchasers)

was a "pass-on" theory indistinguishable in all important respects from the theory of damages (purchasers suing remote sellers) at issue in *Illinois Brick*. The district court agreed with the defendants and dismissed the complaints with prejudice for failure to state claims upon which relief could be granted. The court did not file an opinion, but stated from the bench that the dismissal was based on *Illinois Brick*.

The main issue is whether the complaints should have been dismissed on the strength of *Illinois Brick*. The plaintiffs/appellants also urge that the district court erred in striking from the complaints allegations of retail price-fixing. The plaintiffs in *Pony Creek Cattle Co., Inc., et al. v. The Great Atlantic & Pacific Tea Co., et al.* appeal partial summary judgments granted against them on their allegation that the statute of limitations was tolled because the defendants fraudulently concealed the alleged conspiracy. We agree with the defendants-appellees that the claims for damages, as pleaded, are within the ambit of the rule of *Illinois Brick*. Nevertheless we reverse and remand in all thirteen cases because the complaints state claims for damages within the "cost-plus" exception to the *Illinois Brick* bar. We reverse the partial summary judgments entered on the issue of fraudulent concealment in *Pony Creek*. In the *Agee* and *Varian* cases, we reverse the district court's order striking the allegations of retail price-fixing. In addition, we hold that the complaints in all the cases state claims for injunctive relief under section 16 of the Clayton Act.

---

1. The lawsuits involved in this appeal are: *Petersen et al. v. Safeway Stores, Inc., et al.; Pony Creek Cattle Co., et al. v. The Great Atlantic & Pacific Tea Co., et al.; Lowe, et al. v. Safeway Stores, Inc., et al.; Meat Price Investigators Ass'n et al. v. Safeway Stores, Inc., et al.; Shoshone Tribe of Duckwater, et al. (formerly styled Agee, et al.) v. Safeway Stores, Inc., et al.; Black, et al. v. Acme Markets, Inc., et al.; Chapparal Cattle Corp., et al. v. Safeway Stores, Inc., et al.; Becker, et al. v. Safeway Stores, Inc., et al.; Varian, et al. v. Safeway Stores, Inc., et al.; and Little Ranch Co., et al. v. The National Association of Food Chains, et al.*

2. "Passing-on" usually means the process whereby a middleman in the chain of distribution who has been overcharged by a manufacturer or by a producer adjusts his prices upward in sales to a lower level in the chain to reflect the overcharge. This case presents the converse of that situation. Here the passing-on was the result of alleged depressed prices fixed by retailers and imposed upon the middlemen (slaughterhouses and packers). In turn, the middlemen passed-on the undercharge, the depression in prices, to the primary producers (cattle ranchers and feeders).

## I.

These actions were dismissed on the pleadings. The allegations of the complaints therefore are taken as true for purposes of these appeals.

The plaintiffs are all cattle ranchers or feeders or both. Cattle are bred and raised on farms, ranches, and commercial feedlots. The animals are fattened for slaughter by feeding them a concentrated ration for fast growth. Ranchers either fatten the cattle themselves or sell to or place the livestock with feeders for fattening. Most fat cattle, say the plaintiffs-appellants, are purchased by slaughterhouses and packers directly from the ranchers and feedlots, although some are purchased by the slaughterers through auction markets. The cattle are then slaughtered and most of the beef is sold as either boxed or carcass beef to retail and wholesale grocers. The large retail food chains buy most of their beef directly from slaughterers and packers. The complaints do not allege a conspiracy between the slaughterers and packers and the defendants.

The plaintiffs allege that the wholesale or carcass price of beef, the price paid by the retail chains to packers and slaughterers, is established by the large retail chains acting in concert. For any given week, it is alleged, the wholesale price in a given area of the United States is set by the pricing decision of the A & P or Safeway Stores, Inc. or the Kroger Co. or one of the other defendants. In antitrust jargon, each wields monopsony power in its region or, with others, oligopsony power.[3] One designated retail chain in a given area will buy its beef in the regional wholesale market early in the week. The pricing decisions of the leading purchasers in the various regions of the nation are reported in the National Provisioner Daily Market and News Service, ("National Provisioner") or "Yellow Sheet", and thus become known to the entire wholesale beef trade. The other retail chains, it is alleged, then follow the price established by the regional leader in purchasing their requirements of beef for the period. The chains, according to the complaints, can dictate the wholesale price to the packers because they wield monopsony or oligopsony power and because the packers have no long-term storage facilities and therefore cannot withhold their product.[4] The chains' power is augmented by their considerable cold-storage capacity: they can blunt price rallies by abstaining from the wholesale market and working from their stockpiles.

The price depressions thus engineered are directly "passed on" to the ranchers and feeders, according to the complaints. The plaintiffs allege that the cattlemen, like the slaughterers and packers vis-a-vis the chains, are in no position to negotiate prices because they cannot, at least in the short term, withhold their product. A fattened steer or heifer, the complaints allege, must be sold within three weeks of the time it reaches choice grade. If the animal is not sold in that time it becomes over-fattened and hence less valuable. The supply of fat cattle is therefore inelastic in the short term. The cattlemen contend that they must take the price the packers quote. The packers, according to the complaints, bid prices derived directly from the Yellow Sheet (or, west of the Rockies, the Safeway) carcass price. Working from estimates of the percentage of an animal that will be carcass beef salable to the retain chains, the packers pay cattle prices based on the Yellow Sheet prices.[5] Thus, the allegedly arti-

---

3. We use the term "monopoly" to refer to price-fixing by sellers; "monopsony" and "oligopsony" to refer respectively, to price-fixing by a single purchaser or by a group of purchasers, that is, the retailers/defendants in this case.

4. Chainwide pricing decisions for a given region are made possible, according to the allegations of the complaints, by the chain's centralized buying practices. Purchases are made for an entire chain or for a large part of a chain, it is alleged, from a central location.

5. As explained in Paragraph 28 of the Amended and Substituted Complaint in the *Meat Price Investigators Association* ("*MPIA*") suit:

   Cattle buyers for beef slaughterers figure the percentage of dressed meat on the live animal and give the cattle feeder a price for the

ficially low wholesale prices established by the retail chains' combination translate directly into artificially low prices for fat cattle.

The plaintiffs do not know when this alleged conspiracy began, but contend that it has been in operation since 1963 at the latest. The food chain defendants, according to the complaints, coordinate their efforts through meetings conducted by the National Association of Food Chains. The conspirators allegedly effect their price-fixing schemes by allocating to dominant chains geographical areas in which to exercise price leadership, and by controlling or manipulating the "Yellow Sheet". The elimination of price competition is further assured by alleged agreements concerning the conspirators' respective specifications for beef. The plaintiffs charge that the chains in any given region coordinate their specifications so that the chains do not compete with each other in purchasing beef of their respective specifications.

The complaints were filed in 1975. The cattlemen charge that the scheme violates section 1 of the Sherman Act, because it is a scheme "in restraint of trade and commerce". They also contend that the scheme was "an attempt to monopolize" and had the effect of monopolizing the wholesale beef market in violation of section 2 of the Act. The complaints also allege that the retail chains fix the retail price of beef to consumers. They request injunctive relief, under section 16 of the Clayton Act, and treble damages going back to the beginning of the alleged conspiracy. The Clayton Act's four-year statute of limitations would ordinarily operate to limit recovery to damages accruing within four years of the filing of the complaints.[6] The plaintiffs, however, urged that the defendants and their co-conspirators fraudulently concealed the

conspiracy from the beginning, and that the statute of limitations therefore did not begin to run until the plaintiffs discovered, in July 1974, that the alleged conspirators had indeed met to discuss the pricing of beef.[7]

In late 1975, before the instant actions were consolidated in the Northern District of Texas, that court entered partial summary judgments in the *Pony Creek* case, a suit originally filed in the Northern District of Texas, dismissing with prejudice the *Pony Creek* plaintiffs' claims for damages that accrued prior to June 5, 1971. In December of 1976, following the consolidation of the various actions in the Northern District of Texas, the defendants filed motions for partial summary judgment on the statute of limitations issue in the remaining suits. The district court denied those motions. The *Pony Creek* plaintiffs filed a motion to vacate the earlier partial summary judgments entered against them, but the district court has not acted on that motion.

In June 1977 the defendants in all the cases filed a joint motion for judgment on the pleadings based on the Supreme Court's opinion in *Illinois Brick*. They pointed out the absence of any allegations that the plaintiffs had sold cattle directly to the defendant retail chains. The suits, they contended, were therefore barred by the general rule of *Illinois Brick* that only those parties who have dealt directly with members of a price-fixing conspiracy can maintain an antitrust action for damages against the price-fixers. The plaintiffs asked the district court to stay its ruling on the defendants' motion pending further discovery. Six months later, in December, 1977, the district court entered its order dismissing twelve of the suits for failure to state claims and striking the allegations of retail price-fixing. The court dismissed the

---

live animal based upon the value of the dressed carcass according to a formula based on the Yellow Sheet or its west coast counterpart, the "Safeway price."

**6.** Section 4B of the Act, 15 U.S.C. § 15b, states, in relevant part:

Any action to enforce any cause of action under sections 15 or 15a of this title shall be

forever barred unless commenced within four years after the cause of action accrued.

**7.** That information was allegedly disclosed during discovery in *Bray, et al. v. Safeway Stores, et al.,* N.D.Cal., 392 F.Supp. 851 (1975), a suit virtually identical to the instant actions brought by California cattlemen against many of the defendants in these cases.

remaining case—the *Little Ranch* case—in February 1977. All the cases were dismissed with prejudice.

## II.

We address first the most important issue in these appeals: Did the district court err in dismissing the appellants' claims for damages?

## A.

We meet at the outset questions about the applicability of *Illinois Brick* to these actions. The appellants' first line of attack on the district court's decision is the bold argument that *Illinois Brick* simply has no application to these actions. They also urge that, assuming *Illinois Brick* is relevant, the decision cannot bar damage claims against the National Provisioner and the grocery chain trade association because neither is a buyer or seller of beef. In the interests of clarity, our assessment of these contentions will begin with a discussion of the background and rationale of the *Illinois Brick* decision.

The *Illinois Brick* rule barring damages actions against alleged price-fixers by indirect purchasers has its genesis in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 1968, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231. *Hanover Shoe* involved an antitrust treble-damages suit under § 4 of the Clayton Act against a manufacturer of shoe machinery by one of its customers, a lessee of the machinery. The plaintiff claimed damages arising from the defendant's practice of leasing, rather than selling, the machinery, a practice that the plaintiff contended was a violation of section 2 of the Sherman Act. The Supreme Court affirmed the trial court's refusal to permit the defendant to prove up the defense that any illegal overcharges imposed on the lessee shoe manufacturer had been passed on to that manufacturer's customers. The Court referred to a "general tendency in the law" not to trace damages "beyond the first step". 392 U.S. at 488 n.6, 88 S.Ct. 2224, n.6 (quoting *Southern Pacific Co. v. Darnell-Taenzer Lumber Co.,* 1918, 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451).[8] The Court rejected the defendant's argument that the general rule should admit of an exception when economic circumstances are such that the overcharge to the buyer both caused and enabled the buyer to pass on the full overcharge to his customers. The impact of the overcharge on the buyer's pricing decisions, said the Court, cannot be demonstrated with any precision in the ordinary case. 392 U.S. at 492–93,[9] 88 S.Ct. 2224. Recognition of a general passing-on defense would,

---

8. Before *Illinois Brick*, a strong case could have been made that the *Hanover Shoe* decision rested primarily on the Court's perception that the middleman, and not the remote purchaser, is the likeliest enforcer of the antitrust laws. Although it is probable that Hanover, like most middlemen, passed on much of the overcharge, recognition of a passing-on defense would have reduced the incentives for middlemen to sue. Professor Posner has observed: "The choice was thus between overcompensating Hanover and underdeterring United. The Court's preference for the former is consistent with the view that the primary purpose of antitrust damage actions is to deter violations of law." R. Posner, *Antitrust Cases, Economic Notes and Other Materials* 149 (1974). *See Illinois Brick*, 431 U.S. at 752–53, 97 S.Ct. 2061 (Brennan, J., dissenting).

   In *Illinois Brick*, however, the Court observed that the *Hanover Shoe* decision rested primarily on the difficulty-of-proof problem, and not on the deterrence rationale. *Illinois Brick*, 431 U.S. at 732 n.12, 97 S.Ct. 2061 n.12.

9. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in the company's price will have on its total sales. Finally, costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued.
   392 U.S. at 492–93, 88 S.Ct. at 2231.

in the Court's opinion, simply encourage defendants to attempt to establish its applicability, thus complicating and protracting many antitrust proceedings. *Id.* at 493, 88 S.Ct. 2224. The Court rejected the passing-on defense as a general matter and expressed its view that the defense should be permitted only in certain narrow circumstances when the concerns underlying its rejection in *Hanover Shoe* were not present. *Id.* at 494, 88 S.Ct. 2224.

*Hanover Shoe* barred defensive passing-on, the use of passing-on as a defense in an antitrust action. In *Illinois Brick*, the Court resolved a split of authority in the courts of appeals by ruling that, with few exceptions, indirect purchasers of an alleged price-fixer's product cannot maintain a treble damages action predicated on the offensive use of the theory that the price-fixer's overcharge to his customer was passed on to the plaintiffs. The plaintiffs were separated from the price-fixing offenders by two intervening transactions: the bricks moved from the manufacturers through subcontractors and general contractors to the consumers, carrying a four-cent-per-brick overcharge each time the brick changed hands. The court decided that if *Hanover Shoe* were to be followed, offensive as well as defensive use of passing-on must be barred. The Court noted that recognition of a "one-sided" limitation on a passing-on theory of damages would lead to a "serious risk of multiple liability". If offensive use of passing-on were permitted, a price-fixer could be held liable to an indirect purchaser for the amount of the overcharge passed-on to that purchaser by the price-fixer's direct customer yet, lacking a passing-on defense (under *Hanover Shoe*), would be liable to the direct purchaser, his customer, for the full amount of the overcharge.[10] Further, the Court concluded that the rationale of *Hanover Shoe* had not depended on the defensive context in which passing-on was asserted in that case. The "uncertainties and difficulties in analyzing price and output decisions" in the real world, 431 U.S. at 731–32, 97 S.Ct. at 2068, the "principal basis" for the *Hanover Shoe* holding, *id.* at 731, 97 S.Ct. 2061, counseled rejection of offensive passing-on as well. Those same "evidentiary complexities and uncertainties" and undesirable delays would attend the effort of indirect purchasers to establish that illegal overcharges were passed on to them. *Id.* at 732, 97 S.Ct. 2061. The Court decided, therefore, that the passing-on theory of damages must be barred in those situations in which the defendant could not assert a passing-on defense against his direct purchasers. *Id.* at 735–36, 97 S.Ct. 2061.

■ Because *Illinois Brick* adopted a unified "mutuality" approach to passing-on problems we must reject the appellants' argument that *Illinois Brick* has no application to these suits insofar as they seek relief for violations of Section 2 of the Sherman Act. Under *Illinois Brick*, the plaintiffs would be entitled to urge a pass-on theory of damages only if the defendant retail chains could use a passing-on defense to claims brought by the packers and slaughterers. Whether the plaintiffs can proceed on a passing-on theory of damages is, applying the mutuality principle, a question unaffected by their denomination of the claim. Absent exceptional circumstances, *Illinois Brick* and *Hanover Shoe* limit the use of passing-on theory in antitrust actions without regard to the parties' characterization of the offense.

10. A serious risk of overlapping liability would remain even under a rule permitting the offensive use of passing-on only in situations in which the defendant could use a passing-on defense, unless the scope of passing-on were narrowly restricted to cases in which the incidence of overcharges could be established with certainty. That risk would arise from the risk of inconsistent factfindings in separate lawsuits by direct and indirect purchasers. Note, *Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation*, 63 Cornell L.Rev. 309, 319 n.43 (1978). The magnitude of that risk would vary directly with the speculativeness of the proof of the incidence of the overcharge. By narrowly limiting the use of passing-on to cases in which the overcharge can be traced with ease and certainty, see part II, B of this opinion below, the Supreme Court has all but eliminated this risk of duplicative liability.

The appellants' most ambitious contention is that *Illinois Brick* is entirely inapposite to price-fixing suits brought by sellers against indirect purchasers. They point out that *Illinois Brick* involved purchasers who charged price-fixing by a remote seller and contend that *Illinois Brick* should be limited to that type of case because the harm suffered by sellers in cases such as this one is much greater than the harm suffered by indirect purchasers in the paradigmatic *Illinois Brick*-type case. Especially is this so, they urge, when, as here, the alleged price-fixing conspiracy stands like a tollgate athwart the powerful "middle position" in the beef marketing system. The cattlemen's argument, we take it, is that the serious harm flowing from monopsony or oligopsony price-fixing at a middle tier in an industry's structure outweighs the considerations, avoidance of overlapping liability and concern about complexities and uncertainties of proof, that underlay *Illinois Brick*—concerns that the Court may have overemphasized. *See* The Supreme Court, 1976 Term, 91 Harv.L.Rev. 70, 221–31 (1977).

The first step in assessing this argument is to examine the claim that the harm engendered by monopsony or oligopsony pricing of the kind alleged is, as a categorical matter, greater than that engendered by monopoly pricing. We focus first on monopsony or oligopsony pricing in general,

without regard to the position occupied by the price-fixing combination in the productive chain. On this point, the appellants' contentions center on the harm suffered by the competitors themselves—the sellers. In the case of monopoly price-fixing, they say, the damaged buyer has a choice: he can refuse to buy the affected product and buy, instead, a substitute. In the monopsony or oligopsony price-fixing case, however, the seller faces a Hobson's choice: he can sell into the rigged market and take the depressed price, or he can refuse to sell at all. In their case, say the cattlemen, this means destroying fat cattle or, in the long run, cutting back production or going out of business.

We might acknowledge the difference as a general matter, but we have no reason to believe that the damage caused by the typical monopsony or oligopsony price-fixing scheme is significantly greater than that caused by the usual seller price-fixing scheme. Both types of price-fixing are attended by restrictions in industry output and the consequent reallocation of resources to less valuable uses.[11] The appellants argue that the reallocation process in the monopsony price-fixing case is inherently more likely than in the monopoly price-fixing case to cause business failures.[12] Assuming this to be true, *arguendo,* we do not think that this distinction is sufficient to

---

11. *See generally* J. Hibdon, *Price and Welfare Theory* 244–53 (Monopoly pricing); 264–67 (Monopsony) (1969); K. George & J. Shorey, *The Allocation of Resources* 150–52 (1978).

12. In the case of monopoly price-fixing, the price-fixing generally raises the price of all goods that incorporate the product subject to the price-fixing. If the conspirators sell directly to the consuming public, the only businesses adversely affected are those in industries that supply complementary goods. If the conspirators do not sell directly to the consuming public, then the product is but an input in the production of other goods or services. By raising the cost of that input, the price-fixing conspiracy might conceivably have the effect of driving marginal firms that use the input out of the market. The likelihood of this occurring depends upon the magnitude of the cost of the input relative to the purchasing firm's total costs of production and on the elasticity of

demand for the firm's product. A fifteen percent rise in the cost of beef, for example, threatens the profitability of a steakhouse far more than that of a grocery store. The impact will be greatest in the rare case of a firm that simply buys and resells only the good affected by the price-fixing conspiracy.

Most firms that sell directly to the typical monopsony or oligopsony price-fixing conspiracy, however, are in a position analogous to that of the single-product distributor who purchases his product from price-fixing conspirators. The good affected by the price-fixing conspiracy is likely to be the seller's only product or to represent a significant percentage of the seller's output. In general, the impact on a firm's revenues of a purchaser price-fixing scheme aimed at the product it sells is greater than the impact on a firm's costs of a monopoly price-fixing scheme affecting an input into the firm's product.

warrant disparate treatment of monopoly and oligopsony. for purposes of pass-on problems. If the *Illinois Brick* decision is grounded on a balancing of the deterrence and compensation policies of the treble-damages action against considerations of judicial economy and fairness to defendants—a view of *Illinois Brick* that is crucial to the appellants' argument[13]—it seems to us that the Supreme Court chose to permit entire price-fixing schemes, in some circumstances, to go unremedied by private damage actions. If the Court felt that competing considerations outweigh the costs of leaving unremedied the totality of harm flowing from some monopoly price-fixing schemes, we find it difficult to believe that the incremental harm, in the form of possible business failures, that might flow from unremedied monopsony or oligopsony price-fixing schemes would tip the Court's balance in favor of enforcement in the purchaser price-fixing case. The increment is too insignificant in comparison with the total damage caused by price-fixing.

The appellants urge that the Supreme Court has recognized that conspiracies aimed at sellers are especially abhorrent. None of the cases they cite, however, establish anything more than the unsurprising proposition that producers damaged by anti-competitive schemes have a remedy under the antitrust laws.[14] As support for their contention that conspiracies at the strategic middle position or "bottleneck" in an industry's structure are especially disfavored, they cite the Supreme Court's decisions in *American Tobacco Co. v. United States,* 1946, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575, and *Standard Oil Co. of New Jersey v. United States,* 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619. Those decisions, it is true, recognize the seriousness of monopsony or oligopsony at the dominant middle of an important industry's productive chain, but they do not single out that situation for special treatment under antitrust laws. We cannot carve from an important antitrust rule intended to be of general application exceptions based on the sheer magnitude or impact of the particular conspiracy alleged.

■ We conclude that there is nothing special about monopsony or oligopsony price-fixing cases that justifies treating them differently from monopoly price-fixing cases for passing-on purposes. *Illinois Brick* therefore speaks to the instant cases.

A final issue as to the applicability of the *Illinois Brick* rule concerns the appellants' cases against the National Provisioner and the National Association of Food Chains. The appellants argue that the *Hanover Shoe-Illinois Brick* limitations on the use of passing-on theory apply only to suits brought against firms that are in the chain of production. They theorize that the "central rationale" of the *Hanover Shoe* and *Illinois Brick* decisions is that firms dealing directly with the alleged price-fixer are likelier than firms remote in the productive chain to sue and that severe limitations on the use of passing-on theory are necessary

**13.** If *Illinois Brick* did not involve such a balancing, even implicitly, then the appellants' argument that the greater harm flowing from purchaser, as compared with seller, price-fixing, justifies special treatment of passing-on problems in monopsony cases loses its premise. Formally, at least, *Illinois Brick* involved no such balancing as suggested in the text. The *Illinois Brick* holding is essentially the rule of mutuality. That rule was justified almost entirely by reference to the problem of overlapping liability, and the Court's focus on the risk of overlapping liability was a result of its assumption that direct purchasers, as well as indirect, would likely sue the price-fixers. On the surface of it, then, *Illinois Brick* does not acknowledge that its pass-on rule involves any significant sacrifice of antitrust enforcement: in those cases in which the rule bars indirect purchasers from suing, the direct purchasers, it is assumed, will likely come to the fore.

**14.** *E.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 1969, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129; *Continental Ore v. Union Carbide & Carbon Co.,* 1962, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777; *Klor's, Inc. v. Broadway Hale Stores, Inc.,* 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741; *Mandeville Island Farms v. American Crystal Co.,* 1948, 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328. The cases cited by the appellants, with the exception of *Mandeville Island Farms,* were cases involving monopolization or exclusionary practices, not price-fixing. None involved passing-on theories of damage.

lest direct-dealing firms be discouraged from bringing suit. Because the trade publication and the trade association do not buy or sell beef at all, the argument continues, there are no firms in the beef marketing system that deal directly with these defendants. The cattlemen, the appellants conclude, are as likely as anyone to bring suit against those defendants.

■ The argument rests on a faulty premise. The *Illinois Brick* decision rested on avoidance of overlapping liability and on concern about the complexities and uncertainties of proof that would attend general recognition of passing-on theories of damage. What is critical is not whether a defendant competes in the relevant industry but whether the plaintiff's action (or the defendant's defense) asserts a form of passing-on theory. The complaints in these cases do so. The National Provisioner and the National Association of Retail Chains do not buy or sell beef but the appellants' complaints charge that they conspired with firms that do buy beef to fix the purchase price of boxed and carcass beef. That the trade publication and trade association defendants do not market beef does not diminish the problems of overlapping liability and uncertainty of proof posed by the use of a passing-on theory of damages. The doctrine of *Illinois Brick* therefore applies

to the complaints against these two defendants.

**B.**

Having determined that the *Hanover Shoe-Illinois Brick* doctrine applies to the damages claims in their entirety we turn to the appellants' contentions that these actions fit recognized exceptions to the bar against use of passing-on theory.

*1. The Co-Conspirator Exception.*

Certain of the appellants contend that the complaints in these actions, liberally construed, allege a conspiracy between the retail chains, on the one hand, and the packers and slaughterers on the other.[15] They argue for an exception from the *Illinois Brick* rule for cases involving a conspiracy between the remote price-fixers and the direct-dealing intermediary.

They argue, first, that cases involving conspiracy spanning two levels in the chain of distribution fit the exception recognized in *Illinois Brick* for cases in which the defendant owned or controlled its customer (the middleman). *Illinois Brick*, 431 U.S. at 736 n.16, 97 S.Ct. 2061 n.16.[16] If the retail chains conspired with the packers and slaughterers, they urge, the retailer can be said to have "controlled" the middleman within the meaning of footnote 16 of *Illinois Brick*. Market forces would have been

---

**15.** Indeed, many of the allegations strongly suggest that all the non-defendant co-conspirators adverted to in the complaints are food retailers. Paragraph 34 of the MPIA Amended and Substituted Complaint, for example, states in part:

    b. Specifications have been established by the defendant retail food chains and other co-conspirators for the beef they buy. In most instances, the specifications for beef carcasses or parts thereof have varied . . . thus eliminating competition between and among the defendants and other co-conspirators.

    c. The defendant food chains and other co-conspirators have allocated retail marketing areas . . . . .

    d. The defendant food chains and other co-conspirators have agreed not to compete with one another on a price basis in purchasing beef at wholesale . . . . .

    e. . . . Through uniform entry into the wholesale beef market or uniform with-

drawal from the wholesale beef market, the defendant food chains and other co-conspirators have combined to monopolize to affect the demand for beef products and artificially depress the wholesale price of beef products to an unreasonably low level, which level is directly reflected by the Yellow Sheet price and the 'Safeway price,' and which prices are directly passed on to the beef producer.

**16.** "Another situation in which market losses have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer. Cf. *Perkins v. Standard Oil Co.,* 395 U.S. 642, 648, 89 S.Ct. 1871, 1874, 23 L.Ed.2d 599 (1969); *In re Western Liquid Asphalt Cases,* 487 F.2d 191, [at] 197, 199." But "reliance upon direct purchasers to bring suit is wholly unjustified when they are controlled by the prospective defendants". The Supreme Court, 1976, 91 Harv.L. Rev. 70, 230 (1977).

superseded in such circumstances. There would then be no indirect dealing problem, it is argued, since those selling to the packers and slaughterers would have dealt directly with the price-fixing conspiracy.

Even if proof of a multilevel conspiracy would not bring the case within the "control" exception recognized in *Illinois Brick*, it is urged, we should recognize a distinct exception for vertical conspiracies. The appellants argue that the defendants remote from the plaintiffs in the chain of distribution do not run the risk of double liability if it is proved that the intermediary was an equal participant in the price-fixing conspiracy, for the co-conspirator intermediary could not recover in a suit against the remote seller or purchaser. This is so, they say, because "when parties of substantially equal economic strength mutually participate in the formation and execution of the scheme and bear equal responsibility for the consequent restraint of trade, each is barred from seeking treble damages from the other". *Columbia Nitrogen Corp. v. Royster Co.,* 4 Cir. 1971, 451 F.2d 3, 15. *See also Premier Electrical Constr. Co. v. Miller-Davis Co.,* 7 Cir. 1970, 422 F.2d 1132, *cert. denied,* 1970, 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58.

As the appellees point out, however, the co-conspiracy theory now urged by the plaintiffs-appellants was not set forth in the complaints. The theory of the complaints, both before and after the *Illinois Brick* decision, was that the defendants conspired to fix the prices paid to packers and that the packers simply "passed on" the price depression to cattlemen. Certain allegations in the complaints refer to unnamed co-conspirators, and the appellants now contend that the packers and slaughterers are included among those unnamed co-conspirators. Various paragraphs in the complaints refer to the unnamed co-conspirators as nondefendant food retailers. Nothing in the complaints, however, suggests that packers or other intermediaries conspired with the defendants. In their joint reply brief the appellants cite paragraph 34 of the *MPIA* and *Becker* Amended Complaints as an example of a packer conspiracy allegation.[17] That paragraph, however, states merely that most slaughterers and packers have standing agreements with the defendant chain stores to supply fixed quantities of beef each week, and that the Yellow Sheet or "Safeway" price paid the packers sets the price that the packers pay the plaintiffs for their cattle. This is merely an allegation of passing-on, not of conspiracy. No agreement to fix prices is alleged. If the act of passing-on sufficed to brand the intermediary as a co-conspirator the asserted exception would wholly swallow the *Hanover Shoe-Illinois Brick,* rule.

The appellants urge that the district court abused its discretion by failing to give them adequate opportunity to amend their complaints, after the *Illinois Brick* decision, to allege a vertical conspiracy, and by denying post-judgment requests for leave to amend. We do not agree.

Leave to amend pleadings should be granted liberally when previously unimportant factual issues gain significance as the result of rulings on a point of law handed down during the pendency of the litigation. *E. g., Commissioner of Internal Revenue v. Estate of Donnell,* 5 Cir. 1969, 417 F.2d 106. In none of these cases, however did the district court before the entry of its dismissal order deny the plaintiffs leave to amend their complaints in light of *Illinois Brick.* And all plaintiffs had a reasonable opportunity to amend before the district court ruled on the defendants' dismissal motions. Those motions, based on *Illinois Brick,* were filed on July 17, 1977, eight days after the

---

17. That paragraph states:

Most slaughterers and packers have standing agreements with various receivers, including the defendant chain stores and other co-conspirators, for certain quantities of beef each week. With knowledge of their weekly requirements and of the prices quoted in the Yellow Sheet or the "Safeway Price," the packers and slaughterers directly pass down the price established by the defendant retail food chains. The packers and slaughterers in aggregate do not suffer any diminution of sales, purchases, margins or profits as a result of this artificially low price.

Supreme Court's decision. The district court did not rule on the motions until October, 1977. In three of the suits, the *MPIA, Becker,* and *Petersen* suits, the complaints were amended, with leave of court, after the filing of the defendants' motions to dismiss. None of those complaints, however, adequately alleged conspiracy. The plaintiffs in the remaining suits stood on the allegations of their complaints, asserting that the "unnamed" co-conspirators mentioned therein were indeed packers and slaughterers. Following the court's communication of its decision to the parties, an attorney for one of the plaintiffs requested that the dismissal be "without prejudice", but none of the plaintiffs attempted to amend the complaints until the *Black* and *Pony Creek* plaintiffs, *after* the court's December 9 entry of its order dismissing the suits with prejudice, filed motions for leave to amend.

The district court did not abuse its discretion in denying the post-judgment motions for leave to amend. Rule 15(a) of the Federal Rules of Civil Procedure requires that leave to amend be freely granted "when justice so requires". The Supreme Court has said that motions to amend may properly be denied when there has been undue delay in moving for leave to amend. *Foman v. Davis,* 1962, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222. The plaintiffs have offered no credible explanation for their failure to move for leave to amend until nearly five months after the defendants moved for dismissal on the basis of *Illinois Brick*.[18] Absent any apparent justification for this delay, we cannot hold that the district court abused its discretion. We emphasize, moreover, that these motions were made after the court's entry of the dismissal orders and after the movants had, in their legal memoranda in support of their opposition to the motion to dismiss, asserted that they stood, in regard to the co-conspiracy issue, on the allegations of their existing complaints. The plaintiffs tested the theory that their embellished allegations of passing-on were equivalent to allegations of packer complicity in the price-fixing conspiracy and lost. We have said before that

[m]uch of the value of summary judgment procedure . . . would be dissipated if a party were free to rely on one theory in an attempt to defeat a motion for summary judgment and then, should the theory prove unsound, come back long thereafter and fight on the basis of some other theory.

*Freeman v. Continental Gin Co.,* 5 Cir. 1967, 381 F.2d 459, 469–70.

The Supreme Court in *Foman* also declared that denial of leave to amend is proper when the proposed amendment would be futile. *Foman v. Davis, supra,* 371 U.S. at 182, 83 S.Ct. 227. The district court's denial of the post-judgment motions was supportable on this ground as well. Amendment of the complaints to allege a vertical conspiracy would not have brought these actions within the "control" exception in *Illinois Brick*. In footnote 16 of *Illinois Brick* the Court suggested the intended scope of the "control" exception by citing the Ninth Circuit's decision in *In re Western Liquid Asphalt Cases,* 1973, 487 F.2d 191, *cert. denied,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474. In that case there was evidence tending to show that the defendants controlled their direct customers "either through acquisition of stock, or indirectly through various financial arrangements, including credit". *Id.* at 195. It has been suggested that "courts should invoke the exception only to ensure that sellers do not insulate themselves from suit . . . by strong-arming direct purchasers into choosing not to sue". Note, *Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation,* 63 Cornell L.Rev. 309, 328–29 (1978). The plaintiffs in these suits have never suggested that the grocery chains "controlled" the packers or slaughterhouses, either through stock ownership or credit arrangements. Indeed, the plaintiffs proposed to amend their complaints to allege a vertical conspir-

---

**18.** The only explanation given is the *Chapparal* plaintiffs' lame assertion that it took a long time to divine the meaning and implications of the *Illinois Brick* decision.

acy, not to allege arrangements by which the defendants controlled the packers and slaughterhouses.

Nor do we think that allegations of conspiracy would bring these cases within an exception for suits alleging vertical conspiracy. It is true that some courts have acknowledged such an exception. *E.g., Florida Power Corp. v. Granlund*, M.D.Fla., 1978, 78 F.R.D. 441; *Donson Stores, Inc. v. American Bakeries Co.*, S.D.N.Y., 1973, 58 F.R.D. 481. Whatever the merits of the arguments for such an exception in general, we do not think that the reasoning of *Illinois Brick* permits recognizing the exception when, as here, the alleged co-conspirator middlemen are not named as parties defendant. Absent joinder of the packers and slaughterhouses, the rule forbidding one antitrust conspirator from maintaining an action against another for damages arising from the joint activity would not protect these defendants from the risk of overlapping liability. The retail chains could not, in a suit brought by the packers, use a judgment or finding of vertical conspiracy in the instant case to prevent the packers from successfully asserting in their own lawsuit that they did not in fact conspire with the chains and are therefore not barred by the co-conspirator doctrine from recovering damages from the retail chains. *E. g., Mosher Steel Corp. v. N. L. R. B.*, 5 Cir. 1978, 568 F.2d 436. Because the packers are not parties to this suit, the possibility of inconsistent adjudications on the issue of the existence of a vertical conspiracy leaves the defendants subject to the risk of multiple liability that the *Illinois Brick* Court found unacceptable.

For these reasons we uphold the district court's refusal to permit post-judgment amendments to the complaints.

### 2. The "Cost-Plus" Exception.

The appellants urge that outright dismissal of their damage claims was error because the complaints stated good claims within the "cost-plus contract" exception in *Illinois Brick.*

The Supreme Court acknowledged in *Hanover Shoe* "that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—when the considerations requiring that the passing-on defense not be permitted in this case would not be present". 392 U.S. at 494, 88 S.Ct. at 2232. The Court in *Hanover Shoe* seemed to suggest a general exception to the bar against assertion of a passing-on defense, an exception defined by the policies underlying the bar. Cases in which the middleman's customer is obligated under a pre-existing cost-plus contract to purchase a fixed quantity of goods are paradigmatic of this exception. The proof—the contract itself and evidence of its performance—is simple and unequivocal.[19] Uncertainties of proof are thus avoided. The risk of overlapping liability is eliminated or reduced to the barest minimum inasmuch as the evidence is not susceptible of differing interpretations and is unlikely to be accepted in one lawsuit and rejected in another.

As we understand these cases, the Court meant the scope of the exception to be narrow, but it did not imply that only cases involving cost-plus contracts qualify. Commentators have observed that *Hanover Shoe* and *Illinois Brick* permit the assertion of passing-on in situations that are the functional equivalent of the cost-plus contract case. *E. g.*, Note, *Recovery by Indirect Purchasers and the Functions of Antitrust Treble Damages*, 55 Texas L.Rev. 1445, 1454–57 (1978). "Although the Court

---

**19.** In *Hanover Shoe* the Court emphasized the inadequacy of economic theory to the task of tracing the incidence of an overcharge. *See* note 7 *supra*. In *Illinois Brick* the Court elaborated on the point. The Court noted that economic theory provides a formula for determining the incidence of an overcharge, but that the analysis rests on "an array of simplifying assumptions" and assumes knowledge of the elasticities of supply and demand in the relevant market. 431 U.S. at 741–42, 97 S.Ct. 2061. The unacceptability of the assumptions and the near-impossibility of measuring the relevant elasticities renders such incidence analysis little more than a guessing game in practice, the Court seemed to suggest. The Court was concerned not so much with the complexity of such proof as with its speculative character.

intended the exception to have a 'narrow scope', any situation in which [the impact of] the overcharge is essentially determined in advance 'without reference to the interactions of supply and demand' would function in the same way." Note, *Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation*, 63 Cornell L.Rev. 309, 331 n.93 (1978) [citations omitted]. When the impact of an overcharge on a middleman's pricing decisions can be so determined, the uncertainties involved in resorting to general economic theorems are avoided and the clarity of the evidence virtually eliminates the possibility of overlapping liabilities as the result of inconsistent verdicts in separate lawsuits. Functional equivalence is not lost simply because the proponent of passing-on theory cannot demonstrate that the middleman suffered no loss in volume as the result of raising the price to his customers.[20] In the cost-plus contract case itself, the middleman is likely to have suffered a loss of volume and hence profits as a result of the overcharge. His higher selling price will likely have caused potential customers to forego his product. *See* Note, 63 Cornell L.Rev. 309, 329 n.87. The middleman's loss of volume and the indirect purchaser's absorption of the overcharge are wholly separable items of damage.

■ Applying these principles, we conclude that the district court erred in dismissing these actions. The dismissal, we emphasize, was on the pleadings. The question at the pleading stage is simply whether

**20.** In *Yoder Bros., Inc. v. California-Florida Plant Corp.*, 5 Cir. 1976, 537 F.2d 1347, *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540, a panel of this Court reversed a treble damages judgment that was erroneously reduced by recognition at trial of a passing-on defense. The Court ruled that the defense was not available because the evidence of the party asserting the defense did not demonstrate the applicability of the cost-plus exception suggested in *Hanover Shoe*. The Court found that the evidence did not show the effect of a price change on the direct purchaser's total sales or unit costs for a different sales volume. Under the rule of *Yoder Bros.*, the passing-on defense is unavailable absent evidence that the direct purchaser did not suffer harm in the form of lost sales volume, even if it is proved that the direct purchaser passed on the entirety of the overcharge.

Application of the *Illinois Brick* mutuality principle would suggest that, because under *Yoder Bros.* these defendants could not assert a passing-on defense at all in a treble damages suit brought by the packers and slaughterers absent proof that the packers and slaughterers suffered no loss of volume as a result of the alleged price-fixing, the cattlemen should be barred from using passing-on theory offensively against the defendants unless they demonstrate that the packers and slaughterers suffered no loss of volume. If this is so, then the bar against use of passing-on is absolute, for it would be impossible, not simply "virtually" impossible, to make such a showing. Indeed, *Yoder Bros.* has the effect of eliminating the passing-on defense altogether, except perhaps in the very narrow case of a pre-existing, fixed quantity cost-plus contract.

We do not believe, however, that the *Yoder Bros.* Court's treatment of the pass-on issue is viable after *Illinois Brick*. The *Yoder Bros.*

Court's very literal reading of *Hanover Shoe* to require parties asserting a pass-on defense to prove that the intermediary suffered no harm whatsoever rested, we think, on its view that the private treble damage action is of "overriding importance . . . in the antitrust enforcement scheme." *Id.* at 1375. Indeed, *Hanover Shoe* was plausibly read, before *Illinois Brick*, as resting on the view that the strong policy in favor of antitrust enforcement justifies buying enforcement at the expense of overcompensating plaintiffs. *See* note 6 *supra*. In *Illinois Brick*, however, the Court denigrated the importance of the antitrust enforcement rationale in the decision of *Hanover Shoe* and characterized the difficulty-of-proof problem as the key to *Hanover Shoe*. 431 U.S. at 732 n.12, 97 S.Ct. 2061 n.12. Indeed, *Illinois Brick* itself demonstrated that the policy in favor of vigorous antitrust enforcement must sometimes give way in face of the risk of overpunishing antitrust violators. The *Yoder Bros.* panel would not have taken so niggardly a view of the passing-on defense had it had the benefit of the *Illinois Brick* Court's interpretation of the *Hanover Shoe* opinion, or had it known the implications that its decision might have for antitrust plaintiffs after *Illinois Brick*.

Post-*Illinois Brick* commentary, moreover, has generally assumed that the issue of the impact on the direct purchaser's sales volume of an overcharge should not be dispositive in a case involving the offensive use of passing-on theory. *E.g.*, Note, *Recovery by Indirect Purchasers and the Functions of Antitrust Treble Damages*, 55 Texas L.Rev. 1445, 1455 n.69 (1977). *See also*, Note, *Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation*, 63 Cornell L.Rev. 309, 329 n.87 (1978).

the allegations of the complaints state a case within the "cost-plus" exception. The complaints sufficiently allege that the impact of the retail chains' price changes upon the pricing decisions of the packers is determined in advance without regard to the interactions of supply and demand. The plaintiffs allege that the packers set the price of live cattle by strictly applying certain formulae to the Yellow Sheet or Safeway wholesale beef price. Under these allegations a plaintiff would be entitled, once he proved what the competitive wholesale price would have been for a given grade of beef in a given region at a given time, and once he established that the packer to whom he sold strictly applied a formula to the Yellow Sheet price for the particular sale, to damages in the amount of the difference between the price he actually received on that sale of fat cattle and the price he would have received absent price-fixing (computed by applying the packer's formula to the constructed competitive wholesale price). The packer's habitual use of predetermined formulae [21] would enable measurement of the effect on prices for fat cattle of changes in wholesale prices.[22] The plaintiffs have alleged the functional equivalent of cost-plus contracts.

We do not agree with the appellees that the packer pricing mechanism alleged is exactly analogous to the "fixed percentage markup" or cost-based pricing systems rejected by the *Illinois Brick* Court as exceptions to the passing-on rule. In *Illinois Brick* the Court refused to recognize an exception where middlemen "purport" to charge a fixed percentage markup. 431 U.S. at 743, 97 S.Ct. 2061. Here it is alleged that the packers *in fact* engaged in formula pricing. The Court in *Illinois Brick* was skeptical of the plaintiffs' claims because there is evidence that firms purporting to apply fixed markups above costs in fact fit the markup to the elasticity of demand for the product or juggle cost allocations to achieve the same result. F. Scherer, *Industrial Market Structure and Economic Performance* 176 (1970). An intermediary, such as a contractor in *Illinois Brick*, who employs numerous inputs in assembling his final product might bear the larger brunt of an increase in the price of one of his inputs without leaving any evidence that he did so. It is alleged that the intermediaries in these cases determine their purchase price for fat cattle by rigid application of formulae to the wholesale price for carcass beef. Assuming the allegations of the complaints to be true, a packer's absorption of a loss resulting directly from a decrease in the wholesale price would be detectable from a change in his purchasing formulae or from his paying a price for fat cattle that is above the price he would have paid had he adhered to his customary formulae. It is alleged, moreover, that the packers have no reason to depart from their purchasing formulae in the short run because short term supply is, by the very nature of cattle production, highly inelastic.

21. Because these cases come up on appeal from dismissals on the pleadings, we are not concerned with the question whether packers and slaughterers in fact applied pricing formulae without deviation, or with the question whether the formulae employed were such that a change in wholesale prices in a given region had a predetermined effect on the price offered feeders in the region by the packers and the slaughterers. We must assume, for purposes of these appeals, that the plaintiffs could demonstrate that both questions are to be answered in the affirmative.

22. In *Hanover Shoe* the Court pointed out that in attempting to prove a pass-on a litigant would have to demonstrate that the intermediary would not have raised his price absent the overcharge. 392 U.S. at 493 and n.9, 88 S.Ct. 2224 and n.9. This is a causation issue. The Court's general rejection of the use of passing-on theory rested in part on its view that this issue of causation could not, except in rare cases, be resolved with adequate certainty. *See* note 17 *supra*. If, however, an intermediary over a long period of time consistently determines his purchase price by applying a fixed formula to the price he will receive when he in turn sells, the objection based on the speculativeness of the causation evidence disappears. Our legal system routinely permits triers of fact, as indeed it must, to infer causation, or the lack of causation, from the observation of deviation *vel non* from long-indulged habit or practice.

We recognize that it might be said that we are engaging in "the process of classifying various market situations according to the amount of pass-on likely to be involved and its susceptibility of proof in a judicial forum". *See Illinois Brick*, 431 U.S. at 744–45, 97 S.Ct. at 2074. But the Supreme Court itself engaged in such a process in suggesting exceptions to its bar against the use of passing-on theories. If allegations of structural inelasticity of short term supply and of rigid formula pricing by intermediaries do not bring a case within the cost-plus exception for purposes of a motion to dismiss on the pleadings, then the cost-plus exception is a narrow one indeed, and must include only cases involving literal cost-plus contracts.[23] In light of the purposes behind the passing-on bar—preventing duplicative recoveries and avoiding the uncertainties involved in the use of incidence theory—the situation alleged in these complaints is the functional equivalent of the cost-plus contract case.

■ The appellees are correct in asserting that the proposed proof of damages is far from simple. It will require detailed proof as to individual transactions. Attention must focus on the type and grade of cattle sold, and on whether (and which) pricing formulae were used by packers in making particular purchases. The proof must be detailed and particular. But this is a complexity born of quantity. The *kinds* of proof that will be involved, however, are not new to courts, and certainly not to antitrust courts. The cases as pleaded escape *Illinois Brick* only insofar as they avoid the use of general economic theory in tracing the effect of the defendants' price decisions, and only insofar as they can be proved, in the damages phase, with certainty. If, as to a particular transaction, it cannot be clearly shown that the purchasing packer applied a specific price formula, or if other details of a transaction, such as the quantity or grade of cattle, are not available, then the plaintiff cannot recover damages as to that sale.[24]

We reverse the district court's dismissal orders. Because the pleadings state a case within the cost-plus exception. We emphasize that we are not ruling that these plaintiffs are entitled to go to trial. The Supreme Court intended that it be determined early in the litigation whether (or to what extent) a party should be entitled to present a pass-on theory at trial. The defendants will have the opportunity to raise that issue again by summary judgment motion. Given the strictures of *Hanover Shoe* and *Illinois Brick*, the district court may and

**23.** That view was recently taken by the Third Circuit Court of Appeals in *Mid-West Paper Products Co. v. Continental Groups, Inc.*, 596 F.2d 573 (1979), *as amended* April 5, 1979.

**24.** The appellees have suggested that the plaintiffs will have to trace their cattle through the chain of production to establish that the cattle they sold to packers and slaughterhouses were in turn sold, in carcass form, to members of the alleged retail chain conspiracy. If the prices allegedly established by the defendants were uniformly followed by the beef retailing industry, as the plaintiffs allege, however, tracing would be unnecessary. The plaintiffs' theory of damages is not in all respects a pass-on type of theory. Their theory, stated most broadly, is that the activities of the alleged price-fixing conspiracy depressed wholesale prices generally, and not simply the prices paid by members of the conspiracy, and that packers and slaughterers based their purchases of live cattle on the depressed wholesale price. It is immaterial whether or not a steer purchased from a plaintiff found its way into the hands of a conspirator retailer. It is enough if, as alleged, the conspirators' activities caused a general depression in wholesale prices and the intermediary purchasing from a plaintiff based his pricing decision on the depressed wholesale beef price.

We disagree with the recent ruling of a divided panel of the Third Circuit Court of Appeals that one who deals with a nonconspiring competitor of price-fixing firms lacks standing to sue those firms for treble damages. *See Mid-West Paper Products Co. v. Continental Group, Inc., supra* note 23, 596 F.2d 587. That decision supports the appellees' contention, for if a person who deals directly with a nonconspiring competitor lacks standing, then an indirect purchaser from, or an indirect seller to, a nonconspiring competitor of the defendants *a fortiori* lacks standing. We agree with the dissent in *Mid-West Paper Products* that such a plaintiff satisfies the "target area" test for standing, *see* Part IV below, and that the injury suffered by such a plaintiff satisfies the tests for proximate causation. *See* 596 F.2d at 597.

should demand from the plaintiffs in each case a pretrial demonstration that they have definite and particularized proof that they will need to establish damages. Nor does our ruling imply that the plaintiffs may attempt to trace damages beyond the tier comprised of those who sell directly to the packers or slaughterers. Under the allegations of the complaint only those plaintiffs who sold directly to the packers or slaughterers that engaged in strict formula buying are entitled to maintain damage claims. The complaints do not allege that feeders or brokers "passed on" price depressions to ranchers or that they engaged in strict formula buying based solely on Yellow Sheet prices.

### III.

The appellants also appeal the dismissal of their claims for injunctive relief on the basis of *Illinois Brick*. It follows from our ruling that it was error to dismiss the damage claims on the pleadings that it was also error to dismiss the claims for injunctive relief on the pleadings. Our disposition of the injunctive relief issue, however, rests on the broader ground that the *Illinois Brick* rule has no application to claims for injunctive relief.

■ We agree with the reasoning of *Mid-West Paper Prods. Co. v. Continental Group, Inc.*, 3 Cir. 1979, 596 F.2d 573, *as amended* April 5, 1979. The court in that case ruled that *Illinois Brick* does not bar suits for injunctive relief by indirect purchasers in price-fixing actions because the policy considerations underlying the pass-on rule are not implicated in claims for injunctive relief. An injunctive suit does not expose a defendant to monetary liability at all, much less to the risk of duplicative liability, and does not require the trier of fact to determine the incidence of the overcharge. To secure injunctive relief under section 16 of the Clayton Act, the plaintiffs need show only "threatened loss or damage by a violation of the antitrust laws". 15 U.S.C. § 26. To show a threat of such injury, plaintiffs in a case such as this would not have to show the extent of their harm. It would suffice to show by a pre-

ponderance of the evidence that the alleged price-fixing had or will have some adverse impact on the prices they receive for their cattle, or that the conspiracy reduced the packers' demand for fat cattle.

The appellees argue that injunctive relief is barred to indirect sellers or purchasers whose damage claims are barred by *Illinois Brick* because *Illinois Brick* holds that such persons are not injured within the meaning of section 4 of the Clayton Act. Section 4 and section 16, they point out, are coextensive except that section 16, unlike section 4, does not require an injury to the plaintiff's "business or property". It therefore follows, it is urged, that indirect sellers or purchasers barred from section 4 treble damages by the *Illinois Brick* rule are not threatened with legally cognizable injury within the meaning of section 16.

We disagree with the appellees' characterization of the *Illinois Brick* decision. Formally, it is true, both *Hanover Shoe* and *Illinois Brick* held that, with the exceptions previously discussed, the overcharged direct purchaser, and not the indirect purchaser who may ultimately bear part of the overcharge, suffers the full injury for purposes of section 4. Had those decisions even purported to rest on a divination of the original meaning of section 4 of the Act we would agree with the appellees that *Illinois Brick* has clear implications for injunctive actions under section 16 as well. But neither *Hanover Shoe* nor *Illinois Brick* involved statutory construction in the ordinary sense. They are judicial glosses on an old statute, predicated on contemporary policy considerations. The implications of those decisions therefore reach only as far as the policy considerations informing them.

### IV.

In its December 1977 order dismissing the actions, the district court granted the defendants' motion to strike allegations of retail price-fixing from the complaints. Those allegations charged the retail chains with conspiring to set artificially high prices for beef sold to retail consumers. The plaintiffs in all the suits appeal that action.

■ It was error to strike the allegations of retail price-fixing in the *Agee* and *Varian* complaints.[25] These complaints allege that some of the plaintiffs have purchased beef as consumers at prices affected by the alleged conspiracy. Such an allegation is an adequate allegation of the injury to one's "property" within the meaning of section 4 of the Clayton Act. *Reiter v. Sonotone Corp.,* —— U.S. ——, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). That the allegations might have been added to the complaint in the effort to inject highly prejudicial matter into a lawsuit that is primarily based on wholesale price-fixing, as the appellees charge, is of no consequence, for Rule 18(a) of the Federal Rules of Civil Procedure grants the plaintiffs complete freedom to join in a single action all claims that they may have against any of the defendants. 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1582 (1971).

It was not error, however, to strike the retail price-fixing allegations from the remaining complaints. With the exception of the *Agee* and *Varian* complaints, none of the complaints alleged injury to the plaintiffs' business or property within the meaning of the Clayton Act. The appellants contend that they have adequately alleged injury to their businesses. They say that they intend to prove, under their allegations, that the alleged retail price-fixing conspiracy reduced consumer demand for beef, thereby derivatively reducing the retailers' and the packers' demand for the plaintiffs' fat cattle.

■ The appellants, however, lack standing to sue for such remote injury. Only those within the "target area" of an alleged antitrust conspiracy have standing to sue. *E.g., Jeffrey v. Southwestern Bell,* 5 Cir. 1975, 518 F.2d 1129, 1131. The question of standing is a preliminary one, to be answered from examination of the allegations of the complaint. *Yoder Bros., Inc. v. California-Florida Plant Corp.,* 5 Cir. 1976, 537 F.2d 1347, *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540. Looking to the complaints, we find allegation of retail purchases in only the *Agee* and *Varian* complaints. In the other complaints we find, at best, allegations under which the plaintiffs could show harm flowing derivatively from a reduction in consumer demand. The "target" of a retail price-fixing conspiracy, however, is the retail purchaser. *E.g., Kemp Pontiac-Cadillac, Inc. v. Hartford Automobile Dealers' Ass'n,* 1974, D.Conn., 380 F.Supp. 1382, 1386. To recognize the non-purchasing plaintiffs as "targets" of the alleged retail price-fixing conspiracy would be to grant antitrust standing to firms and persons at every level in the chain of beef production and distribution. "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Hawaii v. Standard Oil Co.,* 1972, 405 U.S. 251, 263 n.14, 92 S.Ct. 885, 891–892, 31 L.Ed.2d 184. Only the *Varian* and *Agee* allegations satisfy the "target area" test for standing to sue.

Shifting ground, the appellants argue that evidence of the alleged retail price-fixing conspiracy is highly relevant to their claims of monopolization and monopsony or oligopsony price-fixing at the wholesale level. The defendants' retail-level activities, they urge, are evidence of the defendants' monopoly power and proclivity to collude. Evidence of those activities is also essential, they contend, to painting for the jury a complete picture of the alleged conspiracy and of the industry in which it operates. They contend, in short, that they simply pleaded evidence.

■ This is not the place or time to debate the relevance of the retail price-fixing evidence. The district court had ample discretion, under Rule 12(f) of the Federal Rules of Civil Procedure, to order stricken from the complaint any redundant or immaterial matter. 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1382 at 807 (1969). Although unnecessary evidentiary details are usually not stricken from the complaint unless prejudicial or of no

---

**25.** The *Agee* suit has been restyled *Shoshone Tribe of Duckwater, et al. v. Safeway Stores,* Inc., et al. We follow the parties' practice of referring to the case as "*Agee*".

consequence to the controversy, *id.; see also Augustus v. Board of Public Instruction,* 5 Cir. 1962, 306 F.2d 862, evidence pleading, as distinguished from the pleading of ultimate facts, is not favored under the Federal Rules. *See* Rule 8(a) Fed.R.Civ.P.; 5 C. Wright & A. Miller, *supra,* at 832–33. Many courts have properly stricken unnecessary evidentiary detail from pleadings. *E. g., Control Data Corp. v. International Business Machines Corp.,* 8 Cir. 1970, 421 F.2d 323; *Commissioner of Internal Revenue v. Licavoli,* 6 Cir. 1958, 252 F.2d 268; *Mitchell v. Hart,* 1966, S.D.N.Y., 41 F.R.D. 138, 143. The district court's action will not be disturbed unless it was an abuse of discretion. *E. g., Commissioner of Internal Revenue v. Licavoli, supra,* at 272. We find here no abuse of discretion. Nor do we perceive how the plaintiffs have been harmed. The district court's order striking the pleadings does not control the issues of materiality and relevancy that govern admissibility of the evidence. *E. g., Control Data Corp. v. International Business Machines Corp., supra,* at 326–27. The plaintiffs need not plead these matters. *Schlick v. Penn-Dixie Cement Corp.,* 2 Cir. 1974, 507 F.2d 374, *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467. "If the trial court considers these matters proper proof upon the trial, he may admit them even though not pleaded." *Alden-Rochelle, Inc. v. American Society of Composers, Authors and Publishers,* 1942, S.D.N.Y., 3 F.R.D. 157, 159.

## V.

The plaintiffs in the *Pony Creek* action appeal the partial summary judgment entered against them on their claim that the defendants' fraudulent concealment of the alleged conspiracy tolled the four-year statute of limitations of section 4B of the Clayton Act. 15 U.S.C. § 15b.

The *Pony Creek* action was filed on June 5, 1975. Unless the statute of limitations was somehow tolled, the *Pony Creek* plaintiffs cannot recover for damages sustained prior to June 5, 1971. They allege in their complaint that they had failed to discover their cause of action before the June 1971 commencement of the limitations period because the defendants had fraudulently concealed it from them. Fraudulent concealment tolls the Clayton Act's statute of limitations. *General Electric Co. v. City of San Antonio,* 5 Cir. 1964, 334 F.2d 480; *Rinzler v. Westinghouse Electric Corp.,* 5 Cir. 1964, 333 F.2d 719. To avail himself of this tolling doctrine, an antitrust plaintiff must show that the defendants concealed the conduct complained of, and that he failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim. *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp.,* 4 Cir. 1976, 546 F.2d 570; *Dayco Corp. v. Firestone Tire & Rubber Co.,* 6 Cir. 1975, 523 F.2d 389.

The defendant Kroger Co. ("Kroger") moved for partial summary judgment on the fraudulent concealment claim. Kroger submitted with its motion evidentiary matter that, it contended, conclusively established that the plaintiffs had known, or would have known through the exercise of due diligence, of the existence of their claims before June 5, 1971. The evidence consisted of copies of numerous articles and reports published in the late 1960's in newspapers and cattle industry trade journals, together with an affidavit attesting to the authenticity of the copies. The articles and reports publicized the dissatisfaction of livestock producers with cattle prices, as well as the charges of many cattlemen that the retail chains were colluding to depress prices. Many of the articles reported the filing, in 1968, of *Bray, et al. v. Safeway Stores, et al.,* N.D.Cal., 392 F.Supp. 851 (1975) a lawsuit brought by several California cattlemen against major retail chains and which involved allegations essentially identical to those of the *Pony Creek* complaint. The defendants' exhibits showed that the allegations of the *Bray* complaint had received much publicity nationwide. The plaintiffs filed no counter-affidavits. They argued that the *Bray* lawsuit revealed no operative facts relating to their claim and that none were revealed until discovery in the *Bray* suit during 1973 disclosed that

some of the defendants had indeed discussed prices at trade association meetings.

Finding no genuine issue of material fact, and mindful of the suggestion in part 1.80 of the *Manual for Complex Litigation* that issues such as fraudulent concealment be determined as early as possible in complex litigation so as to define the scope of discovery,[26] the district court granted the motion.

The *Manual's* salutary principle notwithstanding, the question of when the statute of limitations began to run on the plaintiffs' cause of action is a factual one, *e.g., Ciccarone v. United States,* 3 Cir. 1973, 486 F.2d 253, 256, and is therefore not determinable on a motion for summary judgment. The district court's task was simply to determine whether a genuine question was presented justifying trial, F.R.Civ.P. 56(c), as the court fully recognized. The defendants, as the moving parties, had the burden of demonstrating the absence of any genuine material issue of fact, and the plaintiffs had no obligation to present evidence opposing the motion unless the defendants' affidavit and exhibits initially established the absence of a genuine issue. *Advisory Committee Notes to the 1963 Amendments to Rule 56,* 31 F.R.D. 647, 648; *Adickes v. Kress,* 1970, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142. Kroger's evidentiary showing went entirely to the issues of the plaintiffs' actual or constructive knowledge of their cause of action. The question presented, then, is whether Kroger's showing established the absence of a genuine issue as to the plaintiffs' knowledge, actual or constructive, of their claim.[27]

From the affidavit and exhibits it is abundantly clear that the plaintiffs knew or should have known in 1968 and 1969 of the allegations of the *Bray* complaint. The *Bray* case was widely publicized in numerous issues of numerous trade publications, including, as the district court noted, an issue of The American National Cattlemen's Association's weekly publication *Beef Business Bulletin,* which, according to the supporting affidavit, had at the relevant time a circulation of nearly 300,000. The *Bray* complaint itself was, of course, a matter of public record. It is of no moment that Kroger presented no direct evidence demonstrating that the plaintiffs were actually aware of the *Bray* case. Even assuming that the inferences of actual knowledge to be drawn from Kroger's presentation were insufficient for summary judgment purposes, the evidence was more than adequate to establish beyond doubt that reasonably diligent cattlemen in the plaintiffs' situation would have been aware, in the late 1960's, of the *Bray* allegations. Numerous federal courts have suggested that plaintiffs are chargeable with knowledge of the contents of public records. *E.g., Dayco Corp. v. Goodyear Tire & Rubber Co.,* 6 Cir. 1975, 523 F.2d 389, 394; *Morgan v. Koch,* 7 Cir. 1969, 419 F.2d 993, 998; *Overfield v. Pennroad Corp.,* 8 Cir. 1944, 146 F.2d 889, 898; *Pettibone v. Cook County,* 8 Cir. 1941, 120 F.2d 850, 855. In a case involving a claim that the statute of limitations has

---

**26.** Part 1.80 states in relevant part:

In some complex cases it becomes apparent at the preliminary pretrial conference or shortly thereafter that the determination of a legal question will expedite the disposition of the cause. This is particularly the case where the nature and scope of discovery and further pretrial proceedings would be substantially affected by the determination of the preliminary legal question. For example, in the electrical equipment civil antitrust cases the question whether fraudulent concealment would toll the running of the statute of limitations was one of the most important questions. It was very desirable to secure a determination of this question as early as possible, for if the statute was not

tolled by fraudulent concealment, the discovery would be comparatively narrow in scope of time and a summary judgment on some or all issues could be rendered in many cases.

*Manual for Complex Litigation* 80 (1977).

**27.** Kroger, of course, did not have to demonstrate the absence of triable fact issues as to the allegation that the defendants actively concealed the alleged conspiracy. If the defendants established that the plaintiffs knew or should have known of their cause' of action before June 5, 1971, the running of statute of limitations would not have been tolled even had the defendants affirmatively concealed the alleged scheme.

been tolled, "the means of knowledge are the same thing as knowledge itself." *Wood v. Carpenter,* 1979, 101 U.S. (11 Otto) 135, 143, 25 L.Ed. 807.

The plaintiffs' knowledge of the *Bray* complaint, however, is not *as a matter of law* tantamount to actual or constructive knowledge of their claim. Although the statute of limitations is not tolled simply because the plaintiffs lack much of the evidence supporting their potential claim, *Prather v. Neva Paperbacks, Inc.,* 5 Cir. 1971, 446 F.2d 338, they cannot have notice of a potential claim unless they are aware of some evidence tending to support it. The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice, but to rule that it does so *as a matter of law* is to compel a person situated like these plaintiffs to file suit, on the pain of forfeiting his rights, regardless of whether his attorney believes that there is "good ground to support it". Rule 11, F.R.Civ.P. The mere filing of a similar lawsuit, without more, does not necessarily give "good ground" because that suit might well be frivolous or baseless.[28]

■ The leap from the plaintiffs' knowledge of the *Bray* complaint to actual or constructive knowledge of their cause of action therefore involves factual issues. The defendants had the burden, as the moving parties, to demonstrate conclusively that the plaintiffs, through the exercise of reasonable diligence, would have discovered adequate ground for filing suit. The summary judgment evidence consisted only of a demonstration that the plaintiffs should have been aware of the *Bray* complaint. There is no evidence in the record suggesting that the *Bray* litigation turned up any verification for the allegations before June 5, 1971, or that the plaintiffs had independent access before that time to any information, beyond the *Bray* complaint itself, that tended to verify their suspicions. At best, the materials on file might support an inference that the plaintiffs would have discovered adequate support before June 1971 had they been reasonably diligent. The inference, however, is not so compelling as to entitle the defendants to summary judgment. Because the defendants failed to demonstrate the absence of genuine issues of fact the partial summary judgment must be reversed.

We should emphasize that this ruling is dictated by the posture of the question and the nature of the defendants' summary judgment showing. The plaintiffs bear the ultimate burden of persuasion on the fraudulent concealment issue. The burden is a heavy one. Those who have learned of facts "calculated to excite inquiry" must inquire. *Clement A. Evans & Co. v. McAlpine,* 5 Cir. 1970, 434 F.2d 100, 102, *cert. denied,* 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153. The widely publicized *Bray* complaint certainly put these plaintiffs to a duty to investigate. They must demonstrate to the trier of fact that they investigated with reasonable diligence and discovered nothing that would have justified them in filing suit before June 5, 1971. *Id.; see also Dayco Corp. v. Goodyear Tire & Rubber Co., supra.* In opposing the motion for summary judgment, however, the plaintiffs were not required to make any showing unless the defendants demonstrated that no genuine issues of fact underlay the due diligence question. This the defendants failed to do.

\*　　\*　　\*　　\*　　\*　　\*

The judgments below are REVERSED and the cases REMANDED for further proceedings consistent with this opinion.

---

**28.** That the *Bray* plaintiffs eventually succeeded (in 1975) in their lawsuit is of no consequence, for the *Bray* action might have disclosed nothing about the alleged conspiracy before June 5, 1971.